TINER *v.* STATE.

Opinion delivered June 23, 1913.

1. INDICTMENT—PRESENCE OF PRIVATE COUNSEL IN GRAND JURY ROOM.— A conviction for murder will not be reversed because of the presence in the grand jury room of private counsel for children of deceased, during the inquiry, said counsel not being present when the grand jury was deliberating or voting. (Page 145.)

2. INSTRUCTIONS—SPECIFIC OBJECTIONS—REVIEW.—A general exception to certain instructions will not be entertained on appeal if any of them are good; nor will a general exception to the refusal to give several instructions requested collectively, be considered on appeal, if any of them are bad. (Page 146.)

3. WITNESSES—IMPEACHMENT—TESTIMONY AT FORMER TRIAL.—In a murder trial a witness may be impeached by oral proof of contradictory statements made by him at the coroner's inquest, and the contradictory statements may be proved by members of the coroner's jury. (Page 147.)

4. WITNESSES—CROSS EXAMINATION.—Cross examination should be permitted as to all matters developed on direct examination, and it may be extended into all circumstances surrounding or affecting the transaction which the witness has detailed in his direct examination. (Page 148.)

5. EVIDENCE—CUMULATIVE EVIDENCE—EXCLUSION OF.—It is not error to refuse to admit evidence that is only cumulative of the other testimony which was admitted. (Page 148.)

6. TRIAL—ARGUMENT—EXHIBITING CLOTHING OF DECEASED.—Where the clothing of deceased was exhibited in evidence before the jury, there was no error in permitting the prosecuting attorney to use the garments for illustration in his closing argument. (Page 149.)

7. TRIAL—PRESENCE OF CHILDREN OF DECEASED.—A conviction will not be set aside because the children of deceased were present in the court room and wept during the closing argument of the prosecuting attorney. (Page 149.)

8. EVIDENCE—CONFLICTS IN TESTIMONY—PROVINCE OF JURY—VERDICT.—
It is the province of the ·jury to pass upon conflicts in the testimony.  (Page 150.)

9. HOMICIDE—EVIDENCE—SUFFICIENCY.—Evidence *held* sufficient to warrant verdict of murder in second degree.  (Page 150.)

Appeal from Randolph Circuit Court; *John W. Meeks,* Judge; affirmed.

### STATEMENT BY THE COURT.

The defendant, Thomas L. Tiner, was indicted for the crime of murder in the first degree, charged to have been committed by killing John R. Davis. He was convicted of murder in the second degree, and the jury assessed his punishment at a term of twelve years in the penitentiary. From the judgment of conviction, the defendant has duly prosecuted an appeal to this court.

James Hurn was the principal witness for the State, and testified substantially as follows:

I am, eighty-six years old, and live about fifty yards from Swartz postoffice, in Randolph County, Arkansas. I saw John R. Davis shot from his horse in front of the defendant's wine cellar on the morning of the 24th of September, 1912. Just before the shooting, Davis came from the direction of Dr. John W. Brown's, who was his son-in-law, and rode up to the postoffice at Swartz, where he usually got his mail. After calling for his mail, he rode up in front of my house where I was splitting wood. He had a single barrel shotgun, which he was carrying on his right side with the stock under his right arm and the muzzle down toward his right foot. He was holding the gun with his right hand near the trigger. After some little talk with me, he said, "I was going home this morning, and I thought I would take my gun with me. I suppose Tom Tiner has threatened my life." He then said, "Uncle Jim, there is another thing I want you to do for me. I want you to stand here and watch me until I pass that cellar." He said this two or three times. The cellar he referred to was Tom Tiner's wine cellar. I moved a little from where I was splitting stove wood, so I could have a full view to the cellar along the side of the road,

and see him go on up. There was a little box house over
the cellar, and just before Davis got to the cellar, I saw
the smoke and heard the report of a gun. Davis threw
up his left hand and said, "Oh, Lord," and fell off on the
right side of his horse. When Davis left me at the wood
pile, after asking me to watch him pass the cellar, he
carried the gun as he had it while talking to me. I did
not see him change the position of the gun, or raise it.
He made no attempt to use the gun. When Davis left
me, he traveled toward the west, and the wine cellar was
on his left side. The road was generally used for travel
by the public. From where I was standing when Davis
was killed to where he fell is about 150 yards. The de-
fendant's house is about 100 yards west of the wine cel-
lar, and his son Joe lives a little east of the wine cellar,
but both live on the same side of the road as the wine
cellar. I was greatly excited by the shooting, and hal-
looed to my son and son-in-law, who were picking cotton
near by, and told them that Tom Tiner had killed John
Davis. Soon afterward the defendant walked past my
yard, and said to me, "Uncle Jim, if you want to see a
dead man, there is one lying up yonder in the road." I
said, "Tom, that is the worst thing you ever done in all
the days of your life." He then said, "I killed John
Davis this morning. I had to kill him in self-defense."
I only heard the report of one gun. I can hear pretty
well with one ear, but not good with the other. I had my
good ear turned toward Davis when he was killed. My
eyesight is fairly good, but I can not see as well as a
young man. I wear glasses when I read, but I did not
have them on when I was watching Davis ride by the
wine cellar.

James Hurn, Jr., a boy fifteen years of age, and a
grand-son of the witness, James Hurn, testified that on
the morning of the killing, he was at the spring of the
defendant, which was about fifty yards from his wine
cellar, getting a bucket of water. That he heard three
shots fired. That when the first two shots were fired, he
was at the spring, dipping up water. That he started

home running, and when he got about four steps from the gate leading out of the spring road into the road, the third shot was fired. That he looked up the lane and saw defendant fire a gun toward the wine cellar. On cross examination, he stated that he had not told certain named persons that he did not know anything about the killing except what his grandfather had told him. He said that he told his mother the next day about seeing the defendant shoot toward the cellar, but never told any one else. That he thought nothing about seeing the defendant shoot toward the cellar until Dr. John W. Brown asked him about it just before he testified at the preliminary examination. He said he then told Doctor Brown about it.

Other witnesses for the State testified that three shots were fired. That two of them were fired in rapid succession, and then after a short interval, another was fired. Most of the witnesses said that the first two shots were from a shotgun and the third from a rifle. One of the witnesses said that the first shots were from a shotgun and rifle, and the third from a shotgun. The interval between the first two shots and the third one was variously estimated by the witnesses from eight or 'ten seconds to fifteen seconds. One of them stated that there were two shots in quick succession, and then an interval of hardly a minute when the third one was fired.

Dr. John W. Brown testified that he examined the body of the deceased and found two wounds, one by a shotgun, and the other by a rifle. They both took effect in the left arm two or three inches below the shoulder, and that under ordinary circumstances, either one would have caused immediate death. That Davis was in the habit of traveling the road where he was killed, and had left his house that morning to go home. That he had a single barrel shotgun with him when he started home, and frequently carried it with him.

Thomas L. Tiner, the defendant, testified in his own behalf substantially as follows:

On Sunday preceding the Tuesday on which John R. Davis was killed, Davis and Jesse Cagle came to my wine cellar. They said they wanted their mail, but I had no key to the postoffice. I brought some wine out and gave it to them. Davis and I went down in the cellar together. My son and his wife, who, previous to her marriage, had lived at Dr. John Brown's house, had separated. After talking about the separation for a little while, Davis accused me of being the cause of my son not living with his wife. I disputed his word. He then grabbed his pocket for his pistol, and I grabbed him to keep him from shooting. There were two shots fired from the pistol. As soon as help arrived, I ran out, and went to the house. That evening, my sons told me that Davis had said that he would kill me the first time he caught me with a gun or pistol. On the Tuesday morning following, I was sitting in my office in the wine cellar, working on my books. I heard horse's feet, and, looking up, saw Davis with his gun. I dodged down and grabbed my gun, and Davis fired. Then I fired and jumped back and grabbed another gun and fired it, and Davis fell off of his horse. I then told my son to go and tell Tom Hurn what I had done, and for him to come and take charge of me. I surrendered myself to him. I never fired Mr. Davis's gun or any other gun toward my wine cellar. What Davis meant while in the wine cellar on the Sunday preceding his death when he said that I was the cause of the trouble between my son and his wife was, that my son's wife had said there had been improper relations between her and Doctor Brown.

On cross examination the defendant said: "I had asked my son to bring my gun home on Friday before the killing, and he brought it home on Monday. I shot Davis with the rifle after I had shot him with the shotgun. I was not hunting for Davis, but was trying to keep out of his way. My office at the wine cellar is my place of business, where I keep the books for both my stores, and I am there every day. Davis fired first, and I shot him with the rifle after I had shot him with the

shotgun. When I shot the second time, Davis was working his gun with his hands, and I did not know but that it was a pump gun. I stayed all night in my office at the wine cellar on Sunday and Monday nights preceding the killing. On Sunday evening, my son came to me and told me not to go out of the office, that Davis was standing in James Hurn's field, about fifty yards from the door, and would kill me if I went out. So my wife brought me some quilts and a pillow, and I stayed there Sunday and Monday nights.

One of the sons and a daughter-in-law of the defendant both testified that they saw the beginning of the shooting, and that Davis shot first. Jesse Cagle testified substantially as follows:

I was with Davis at the wine cellar of the defendant on Sunday morning preceding the killing, and Davis and the defendant went into the wine cellar after we had drunk some wine. In company with one of the others present, I started to the postoffice to get our mail, and on our way back we heard two reports from the wine cellar, which sounded like pistol shots. We ran to the wine cellar, and I asked what was the matter. Davis's coat pocket was on fire, and he said Tom Tiner shot at him twice, and he wrung the pistol out of his hand. He further told us that he did not want any trouble, and did not want to kill the defendant, and asked us to say nothing about the occurrence. Other evidence was adduced by the defendant tending to discredit the testimony given by James Hurn and his grandson. Numerous witnesses testified that they knew the reputation of the defendant in the neighborhood where he lived for peace and quietude, and that it was good.

Other evidence will be stated and referred to in the opinion.

*S. A. D. Eaton,* for appellant.

1. The action of the court in permitting private counsel for the children of the deceased to be in the grand jury room while the charge against appellant was being inquired into was reprehensible parctice which

ought not to be tolerated. 53 Miss. 425; 5 Okla. Cr. App. 266.

2. That part of the testimony of the witness, Brown, relative to what the deceased told him in the absence of appellant, was a self-serving declaration on the part of the deceased, was hearsay merely, and clearly inadmissible. 7 Cranch 290; 56 Ark. 331; 10 Ark. 638; 16 Ark. 628; 102 Mo. 170.

3. It was error to admit parol evidence of what the defendant testified at the coroner's inquest. Kirby's Dig., § 800. Being in custody, charged with the killing of Davis, and under oath, his testimony given at that time was not a voluntary statement. 137 Ill. 602; 27 N. E. 677; 110 Ala. 1; 25 La. Ann. 191; 60 Miss. 847. His testimony, as reduced to writing, if admissible at all, should itself have been introduced, being the best evidence of what he said. 2 Ark. 248; 59 Ark. 52; 21 Cyc. 996.

4. The testimony of Jesse Cagle, relative to what Davis told him on the Sunday preceding the killing, was inadmissible as being hearsay, and also a self-serving declaration on the part of the deceased.

5. The testimony of Annie Tiner was admissible for the purpose of showing what led up to the controversy between Davis and appellant, and Davis's motive for being the aggressor. 21 Cyc. 915, and cases; 2 Ark. 229; 14 Ark. 555; 43 Ark. 99; 52 Ark. 303.

6. The case should be reversed for the action of the court in permitting the prosecuting attorney to dress a chair in the bloody garments of the deceased, and to have the three daughters sitting in front of the jury, crying, while he was making his closing argument. It was an attempt to play upon the sympathy and prejudices of the jury, which was reprehensible in the extreme. 12 Cyc. 571; 2 Bishop, New Crim. Proc. 957, and cases cited; 58 Ark. 368; 48 Ark. 106.

*Wm. L. Moose,* Attorney General, and *Jno. P. Streepey,* Assistant, for appellee.

1. There is no merit in the objection raised to the

appearance of private counsel for the children of deceased before the grand jury while they were inquiring into the charge against appellant. *Richardson* v. *State,* ms. op.; 62 Ark. 516.

2. Objections in gross to the giving or refusal to give instructions are of no avail here. 38 Ark. 528; 65 Ark. 521; 75 Ark. 181; 84 Ark. 73; 86 Ark. 322; 87 Ark. 614.

3. If there was any error in admitting the testimony of Doctor Brown as to what the deceased told him, it was invited error, of which appellant can not complain. 95 Ark. 534; *Id.* 438.

4. There was no error in allowing oral proof to be introduced as to what appellant testified to before the coroner's jury, he having made statements in his testimony at the trial contradictory of those made at the coroner's inquest. 99 Ark. 462, 471.

5. The evidence sustains the verdict. It would sustain a verdict of guilty of murder in the first degree. Appellant can not complain that the jury reduced the finding to murder in the second degree. 95 Ark. 175; 105 Ark. 140.

6. There was no impropriety in the argument of the prosecuting attorney. 95 Ark. 237, 240.

HART, J. (after stating the facts). 1. It is first urged that the judgment must be reversed because the court permitted A. J. Witt, private counsel for the children of the deceased, to be in the grand jury room during the time it was inquiring into the charge against the defendant. It is not contended that he was present while the grand jury were deliberating or voting on the charge. The contention of counsel has been decided adversely to him in the case of *Bennett* v. *State,* 62 Ark. 516.

2. Counsel for the defendant assigns as error the action of the court in giving certain instructions, and in refusing others asked by him. He saved the following exception to the refusal to give said instructions:

"Of which said instructions, the court gave the ninth and eleventh, and refused to give any of the others. To

the refusal of the court to give instructions numbered 1, 2, 3, 4, 5, 6, 7, 8, 10, 12, 13, 15 and 16, as asked by the defendant, the defendant at the time excepted, and asked that his exceptions be noted of record, which was accordingly done.''

The court, on its own motion, gave nineteen instructions, and counsel for the defendant saved the following exceptions to the giving of the said instructions: ''To the giving of instructions numbered 1, 2, 3, 4, 5, 6, \7, 8, 10, 12, 13, 14, 15, 16, 17, 18, 19 and 20 by the court, on his own motion, the defendant at the time excepted, and asked that his exceptions be noted of record, which was accordingly done.''

It has been uniformly held by this court that a general exception to certain instructions will not be entertained on appeal, if any of them be good. It is equally well settled that a general exception to the refusal to give several instructions requested collectively will not be considered on appeal, if any of them are bad. *Johnson* v. *State*, 84 Ark. 95; *Atkins* v. *Swope*, 38 Ark. 528, 539; *Geary* v. *Parker*, 65 Ark. 521, 525; *Young* v. *Stevenson*, 75 Ark. 181, 183; *Matthews* v. *State*, 84 Ark. 73; *Owens* v. *State*, 86 Ark. 317, 333; *St. Louis, etc. Ry. Co.* v. *Hambright*, 87 Ark. 614, 623. In the application of this rule, without setting out the instructions given and those refused, it may be said that some of the instructions asked by' the defendant were argumentative, and others were faulty because they singled out facts, and were properly refused by the court, and it is conceded by the defendant that some of the instructions given by the court were correct.

3. It is claimed by counsel for the defendant that the court erred in permitting Doctor Brown to testify that Mr. Davis told him that he took the defendant's pistol away from him in his wine cellar. Counsel for defendant, in his cross examination of Doctor Brown, had brought out the fact that early on Monday morning preceding the day of the killing that John R. Davis had come to his house with a shotgun and a pistol, and that they

had gone to Pocahontas and turned over the pistol to the assistant prosecuting attorney. Many questions were asked Doctor Brown by the defendant in regard to this pistol, and what was done with it. Doctor Brown was also asked in detail as to the movements and conversation of himself and Davis on that day. Besides this, the defendant proved by other witnesses that the deceased had told them that he had taken the pistol away from the defendant at his wine cellar. Under these circumstances, we do not think that any prejudice resulted to the defendant, and it is well settled that a judgment will only be reversed for prejudicial errors.

4. The court did not err in allowing parol proof to be made as to what defendant testified to before the coroner's jury. The evidence on the part of the State tends to show that the defendant voluntarily testified before the coroner's jury, and the evidence now complained of was introduced for the purpose of contradicting the evidence given by the defendant on the trial of the case. The point is expressly so ruled in the case of *Caughron* v. *State,* 99 Ark. 462.

Neither did the court err in permitting the State to prove by the testimony of members of the coroner's jury contradictory statements made by witnesses for defendant before the coroner's jury. *Caughron* v. *State, supra.*

5. It is next assigned as error by counsel for the defendant that the court erred in permitting Jesse Cagle to testify that on the Sunday evening preceding the killing on Tuesday that the deceased had told him that a son of the defendant had pleaded terribly hard with him for the pistol, and that he had refused to give it to him, saying that he had won it in a victory. The court did not err in admitting this testimony. Cagle was a witness for the defendant, and in his direct examination the fact was developed that the defendant and deceased had had a quarrel in the wine cellar on Sunday morning, and the witness was asked all about this quarrel, and stated that Davis had told him at that time that the defendant had tried to shoot him, and that he had taken a pistol away

from him. Everything that occurred in the wine cellar was brought out and introduced in evidence by the defendant. It is well settled that cross examination should be permitted as to all matters developed on direct examination, and it may be extended into all circumstances surrounding or affecting the transaction which the witness has detailed in his direct examination.

6. Annie Tiner was a witness for the defendant. She was the wife of Dee Tiner, a son of the defendant, and they had been separated some time prior to the killing. She had resided in the family of Doctor Brown, a son-in-law of the deceased, for about four years prior to her marriage. She was asked this question: "Was Doctor Brown in any way instrumental in your separation?" And, over the objection of the State, the court refused to permit her to answer the question. The defendant set out that they would have proved in answer to the question that Doctor Brown was the immediate cause of the separation between herself and husband, and that she had confessed to her husband her criminal intimacy with Doctor Brown. That the deceased had asked her to repudiate that statement, and had declared that he would have the statement at any cost, and that this fact was communicated to the defendant prior to the difficulty. In the first place, it may be said that these answers were not responsive to the question asked. The particular objection made by the counsel for the defendant to the court's action in refusing to allow the witness to answer the question is, that the deceased had made a threat against the defendant, and this threat had been communicated to him. The defendant was allowed to introduce evidence of other threats that had been made by deceased and communicated to the defendant, and no attempt was made by the State to disprove them. The defendant was also permitted to prove by other testimony, which was not disputed, that bad blood existed between defendant and deceased on account of the separation of Dee Tiner and his wife, and that the deceased had threatened the life of defendant. Therefore, the

testimony refused was only cumulative of the other testimony which was admitted, and which the State did not contradict.

7. It is next insisted that the court erred in permitting the prosecuting attorney to dress a chair in the bloody garments of the deceased, and because three daughters of the deceased sat in front of the jury crying during the closing argument. · The clothing of the deceased was exhibited in evidence before the jury, and there was no error in permitting the prosecuting attorney to use the garments for illustration in his closing argument. *Derrick* v. *State,* 92 Ark. 237. The daughters of the deceased had a right to be present at the trial, and the judgment will not be reversed because they shed tears during the argument.

9. Finally, it is insisted by counsel for the defendant that the evidence does not warrant the verdict. We can not agree with him in this contention. It is true there is an irreconciliable conflict in many essential respects between the testimony given by the witnesses for the State and that given in behalf of the defendant, but it was the peculiar province of the jury to pass upon this conflict. The defendant was indicted for murder in the first degree. The jury found him guilty of murder in the second degree, and fixed his punishment at twelve years in the penitentiary. Therefore, it is manifest that they did not believe the evidence adduced by either side in its entirety. It is contended by counsel for the defendant that it was a physical impossibility for young James Hurn to have run from the spring in time to have seen the last shot fired. They had measurements made of the distance, and this evidence tended to show that the witness could not have run this distance in the time stated by him. However, the witness himself gave the distance and his credibility was a question for the jury. It is probable, however, that the jury did not believe his testimony in this respect, or they would have found the defendant guilty of murder in the first degree. Even if the jury had discarded his testimony entirely, there was

sufficient evidence to have warranted the verdict of the jury. It is undisputed that bad blood existed between the defendant and deceased on account of the separation of the son of the defendant and his wife, who had formerly lived as a member of the household of the son-in-law of the deceased. They had a quarrel about this matter on the Sunday morning preceding the killing. The defendant remained in the wine cellar during Sunday and Monday night preceding the killing on Tuesday with his guns lying at hand, although his home was only a short distance away. It is true, he states, that he stayed there because he was afraid to go home. The jury may not have believed his explanation, and were warranted in believing from the circumstances, as they found them to exist, that defendant had become angered at Davis because of their quarrel at the wine cellar on Sunday morning, and had formed the design of killing him on sight; that the deceased had formed a similar design as to the defendant, and that in furtherance of this design, each began to shoot at the other as soon as they saw each other. The jury was fairly warranted from all the evidence in finding that each had formed the design of killing the other on sight, regardless of the fact of whether or not he believed his own life to be in danger. They may have thought that the parties entered into a mutual combat, and this view of the case warranted the verdict of the jury. If the testimony of the State in its entirety was believed by the jury, they would have been warranted in finding the defendant guilty of murder in the first degree. On the other hand, if the evidence adduced by the defendant in its entirety was believed by the jury, a verdict of acquittal would have been warranted.

We do not deem it necessary to enter into a further discussion of the evidence, but think it sufficient to say that the evidence supported the verdict of the jury.

The judgment will be affirmed.