[Crim. No. 2342. Third Dist. Sept. 6, 1952.]

THE PEOPLE, Respondent, v. JOHN WHITEHEAD, Appellant.

44

David E. Peckinpah, Denver C. Peckinpah and Daniel L. Jensen for Appellant.

Edmund G. Brown, Attorney General, and Doris H. Maier, Deputy Attorney General, for Respondent.

PEEK, J.—By an information defendant was charged with the crime of murder. He pleaded not guilty to the crime charged and the cause proceeded to trial before the jury. At the conclusion thereof he was found guilty of voluntary manslaughter. He now appeals from the judgment of conviction and the order denying his motion for a new trial.

The facts, which are undisputed, show that on September 16, 1951, between 7:30 and 7:45 o'clock p .m. John Whitehead, the defendant, Eudee Edwards, Eunice Hartfield and Sylvester Adams, the deceased, were standing on Eleventh Street between A and B Streets in the ctiy of Madera. Two eyewitnesses observed the shooting from a point some 100 to 150 feet distant. Both testified they did not know who actually

fired the shots but that the group was engaged in an argument and that they heard some member thereof, the identity of whom they likewise were not able to ascertain, state ''I will kill you.'' Immediately thereafter they heard three shots fired in rapid succession. These witnesses observed the deceased go west on Eleventh Street and the other three go east 20 or 30 feet and turn into an alley. They also testified to seeing one of the group, who was otherwise identified as the defendant, place a gun in his pocket.

In addition to the witnesses above mentioned the state called a police officer who identified the gun; the autopsy surgeon who testified to the cause of death as being from a hemorrhage resulting from a gunshot wound in the leg; and Eudee Edwards.

The principal question presented for decision relates to the correctness of the restrictions placed on the scope of defendant's cross-examination of Edwards, who was the first witness called by the prosecution.

He testified to owning a gun similar to the one he was asked to identify. Counsel then stipulated the gun was the one taken from the Hartfield premises and owned by Edwards. He further testified that he had known Adams, the deceased, for 10 years; that he was on Eleventh Street between A and B Streets on the day Adams was shot; that he had the gun first during the morning of that day but that the defendant had it in the afternoon; that his sister, Eunice Hartfield, was with defendant and himself; that Whitehead fired the gun three times at Adams from a distance of 5 or 6 feet; that after the shots were fired, Whitehead, Hartfield and the witness went to the house where Hartfield lived; that he could not recall there being any conversation either during the walk to the house or afterwards when he and Whitehead were in the backyard; that while in the backyard the empty shells were removed and three new shells were put in the chambers; and that Whitehead went into the house and obtained a shotgun.

On cross-examination Edwards testified, without objection, that a short time before the shooting he gave the gun to Whitehead while they were at ''Tony's Liquor Store''; that Whitehead previously had possession of the gun but that he was not certain of the time. Thereafter the following occurred:

''Q. Where did you first see Sylvester Adams on that day?

"Mr. McClenahan: I object to that as going beyond the scope of cross-, of direct-examination, he testified he saw Adams at the time of the shooting, I believe counsel is limited to that.

"The Court: Objection will be sustained.

"Mr. Peckinpah: Q. Had you seen Sylvester Adams prior to the time that the shots were fired? Don't answer that until counsel has a chance to object to it.

"Mr. McClenahan: I object to it.

"The Court: Objection will be sustained.

"Mr. Peckinpah: Q. When you saw Sylvester Adams immediately before the shots were fired, isn't it a fact that he was moving towards this Defendant?

"Mr. McClenahan: I object to that, there is no testimony on direct examination that he was moving at all.

"Mr. Peckinpah: He did say he was moving.

"Mr. McClenahan: That testimony was stricken from the record. . . . .

"The Court: The objection will be overruled as to that particular question. . . .

"The Witness: Oh, yes, he was moving towards him, yes, he was advancing, coming towards him.

"Q. When you say, 'advancing, coming towards him,' when you say 'him,' you mean John Whitehead? A. Yes, sir, I mean John Whitehead.

"Q. Now, at that time, did Sylvester Adams threaten John Whitehead?

"Mr. McClenahan: I object to that question. There is no testimony whatsoever on direct examination of anything said by the Defendant, and it is wholly improper cross-examination.

"The Court: The objection will be sustained.

"Mr. Peckinpah: Q. At the time that Sylvester Adams was moving towards this Defendant, just before the shots were fired, isn't it a fact that this Defendant was backing away from Adams?

"Mr. McClenahan: I object to that. There is no statement of any direction of movement on the part of Whitehead.

"Mr. Peckinpah: I submit there is not only evidence, but he marked the record where this Defendant was.

"The Court: The objection will be overruled as to that question.

"Mr. Peckinpah: I will re-ask the question in the interests of saving time. Isn't it a fact that when Sylvester Adams was advancing towards Whitehead, that Whitehead was backing away from Adams? A. He backed away from him, yes.

"Q. Isn't it also a fact that at that time, as Whitehead backed away from Adams, he said, 'Don't come up on me'?

"Mr. McClenahan: I object to that. There is no testimony of any conversation whatsoever on direct examination.

"The Court: The objection will be sustained.

"Mr. Peckinpah: How long had you known Sylvester Adams? A. Approximately ten years.

"Q. I beg your pardon? A. Ten years or more, yes.

"Q. How old a man was he? A. I don't know exactly, in his thirties.

"Mr. McClenahan: What was your answer?

"The Witness: I said he was thirty-some-odd years.

"Mr. Peckinpah: About twenty years younger than this Defendant?

"Mr. McClenahan: I object to that question, to that question, there is no testimony of the age of the Defendant, Your Honor.

"The Court: The objection will be sustained.

"Mr. Peckinpah: Q. How big a man was Sylvester Adams? A. Well, I don't know, he weighed about 175, something like that.

"Q. About 175? A. About 175 and 176, something like that."

Subsequent to the sustaining of objections to these questions counsel for defendant asked the court:

"In order to save time, Your Honor, I take it, from the Court's rulings, I am precluded to ask any questions regarding any conversation that occurred at the time of the shooting."

To which the court replied:

"That will be the Court's ruling. In other words, I have permitted you to go into the question of movements, because I think that was part of the location of the People, but everything else that occurred at that time was precluded for the reason that those facts have not been covered on direct examination."

Counsel for defendant then stated that "in view of that ruling, we have no further questions on cross-examination."

Defendant now makes two contentions, (1) that the trial court prejudicially erred in unduly restricting the cross-

examination of the witness Edwards, and (2) that the trial court likewise erred in failing to give certain instructions proposed by defendant.

Section 2048 of the Code of Civil Procedure provides generally that "The opposite party may cross-examine the witness as to any facts stated in his direct examination or connected therewith, and in so doing may put leading questions, but if he examines him as to other matters, such examination is to be subject to the same rules as a direct examination."

It is further provided in section 1854 of the same code that "When part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing, which is necessary to make it understood, may also be given in evidence."

 In elaboration of these rules the writer in 27 California Jurisprudence, 96 et sequitur, states:

"The authorities all agree that wide latitude should be allowed in cross-examination for the purpose of testing accuracy or credibility, especially if the witness is a reluctant one or is hostile, or if he is one of the parties in interest, *or is a witness against a defendant in a criminal prosecution.* The court has, however, discretionary power over cross-examination which will be disturbed on appeal only in case of an abuse thereof. Thus the court may confine an examination within reasonable limits, and *may curtail a cross-examination which is unduly protracted, frivolous, or which relates to matters which are irrelevant, admitted or have already been fully covered.* (Emphasis added.)

██ The fundamental feature of cross-examination ". . . is that a witness, on his direct examination, discloses but a part of the necessary facts. That which remains suppressed or undeveloped may be of two sorts, (a) the remaining and qualifying circumstances of the subject of testimony, as known to the witness, and (b) the facts which diminish the personal trustworthiness of the witness.

"(a) The remaining and qualifying circumstances of the subject of testimony will probably remain suppressed or undisclosed, not merely because the witness frequently is a partisan, but also and chiefly because his testimony is

commonly given only by way of answers to specific inter-rogatories . . . and the counsel producing him will usually ask for nothing but the facts favorable to his party. If nothing more were done to unveil all the facts known to this witness, his testimony (for all that we could surmise) might present half-truths only. Someone must probe for the possible (and usual) remainder. The best person to do this is the one most vitally interested, namely, the opponent. Cross-examination, then, i.e. further examination by the opponent, has for its first utility the extraction of the remaining qualifying circumstances, if any, known to the witness, but hitherto undisclosed by him." (Wigmore, vol. V, [3d ed.] § 1368, p. 33.)

It is undisputed that where a witness testifies as to part of a conversation on direct examination, on cross-examination, the whole of the conversation, at least so far as it is germane to the issues, may be brought out. However, in the present case, as shown by the above summary of the evidence, no testimony whatsoever was introduced on direct examination concerning any conversation between White-head, Edwards, Hartfield and Adams at the time of the shooting. Indeed, it is quite apparent from the record that the prosecution did not want such testimony from the witness Edwards. In fact respondent's argument in support of the propriety of the ruling of the court is that since no such conversation was brought out on direct examination the trial court was correct in limiting the cross-examination as it did.

We do not understand that the rule in this state supports such a fine distinction. Rather it would appear that the situation presented in the instant case comes within the statement of the rule heretofore quoted from Wigmore on Evidence. Nor do we find anything to the contrary in any of the cases cited and relied upon by respondent. Each case may be distinguished on its facts from the situation presented in this appeal.

The proper rule would appear to be that physical acts testified to cannot be arbitrarily separated from the verbal acts accompanying them and made at the same time and place. Such "verbal acts" also must be considered to be admissible in order to prevent the false coloring of the event, to rebut, explain, qualify and possibly to impeach the testimony concerning the physical acts also occurring at that time and place. In other words when testimony has been

introduced relative to an occurrence all parts of that occurrence, verbal as well as physical, are properly within the scope of the cross-examiner's probe. For the trial court to draw the line on a horizontal plane, thereby determining that testimony may be given as to the occurrence of physical acts but that the conversation attendant with such acts is something wholly distinct therefrom and hence may not be admitted, is artificial and may well lead to a coloring of the evidence. ▪ Therefore since the prosecution examined the witness as to the occurrence during which the deceased was shot, it may not so limit such examination so as to preclude the cross-examiner from eliciting conversation which was a part of the same occurrence. By examining the witness as it did it thereby voluntarily opened a door which it cannot arbitrarily close, and the cross-examiner may bring out all the facts within the knowledge of such witness as had transpired at the occurrence testified to in chief, and which are material to a thorough understanding thereof. (Code Civ. Proc., §§ 1854, 2048.)

Although neither party has referred this court to a case directly in point nor has independent research disclosed any such cases, we do find support for our conclusion from other jurisdictions.

Thus, in *Smith* v. *State*, 142 Tex.Crim.Rep. 349 [152 S.W. 2d 751], the trial court refused "to permit the cross-examination of an assistant district attorney who, after testifying as to the circumstances under which a confession was prepared and signed, was asked the question: 'Did you try to get the defendant to confess the crime?'" The court said: "The question was direct and to the point on cross-examination. We do not conceive any necessity for a discussion of the authorities. The court committed error in sustaining the state's objection."

Again, in *Clements* v. *State*, 199 Ark. 69 [133 S.W.2d 844], the court in its opinion said:

"The record reflects that on direct examination witness had stated that deceased had borrowed his pistol a week before the killing and same was returned to him after the killing. The only inference, it seems to us, to be drawn from these circumstances was that the deceased had borrowed the pistol to carry out his threat to kill appellant. We think the court properly permitted the state to elicit from the witness the explanation which had been given to him by deceased

as to why he desired the pistol, and certainly it was proper cross-examination.''

''In *Tiner* v. *State,* 109 Ark. 138, 148, 158 S.W. 1087, 1090, the court said: 'It is well settled that cross-examination should be permitted as to all matters developed on direct examination, and it may extend into all circumstances surrounding or affecting the transaction which the witness has detailed in his direct examination.' ''

Respondent, however, in effect says that even though there be error, under the provisions of article VI, section 4½, such error cannot be held to be prejudicial. We think a reading of the entire record of this case demonstrates the prejudicial character of the error disclosed therein.

As previously stated, subsequent to the testimony of Edwards the prosecution placed two witnesses on the stand, Eileen Brunolli and Joe Foster. These witnesses, together with Edwards, were the only persons to testify to the actual shooting. They both testified to hearing one of the group say ''I will kill you'' and immediately thereafter three shots were fired in rapid succession, but these witnesses were 100 to 150 feet distant from the occurrence, and could not determine who made the statement ''I will kill you'' or understand anything else that was being said. Nor were they able to discern who fired the shots although Foster's testimony disclosed he saw the person otherwise identified as the defendant place a gun in his pocket.

At the conclusion of this testimony the prosecution rested and the defense did likewise.

Thereafter, the prosecution, in its argument to the jury, made much of the fact that the statement ''I will kill you'' was made. The importance placed on this statement by the prosecution is well illustrated by a portion of its argument to the jury wherein the deputy district attorney stated:

''So, you've got to find that by walking towards him, that entitled Whitehead to shoot him down in cold blood. Look at how many people walk toward you every day. The statement, 'I will kill you,' who made it, we don't know. We don't know. Was it made by Whitehead, did he say, 'I will kill you,' then he goes ahead and does it? Was it made by Adams, as he was advancing, was it made by Eunice, was it made by Eudee, was it made by anyone else? We have no evidence at all. We are endeavoring to bring everything before you, everything that could be heard, we endeavored to bring that and include it in the People's case.

You cannot find Adams made that statement. There is nothing to connect him with it. There is nothing to connect Whitehead or Eunice or Eudee as to who made that statement. Words alone cannot constitute justification for self-defense. I can stand here and say 'I will kill you,' I could walk towards you and say, 'I will kill you,' but that is no real or apparent, imminent peril or possibility. I can do it, particularly when I've got two friends standing on either side of me.''

Thus it is apparent that while the prosecution did not want any testimony from Edwards as to who made the statement "I will kill you," it did want the statement in evidence.

It is axiomatic that the prosecution must prove the defendant guilty, not that the defendant must prove himself to be not guilty. Hence the further argument of the prosecution that if the defense wanted the evidence relative to the conversation in the record it should have called Edwards and examined him as its own witness, is no answer to the error here made. The defense had the right to bring such conversation out on cross-examination and cannot be held to have the duty to correct or mitigate the error made by the prosecution in successfully restricting the cross-examination of its witness.

For the reason that the defense was improperly restricted in its cross-examination of a key witness, and that error was prejudicial to the defendant's rights, it is unnecessary to discuss appellant's remaining contention.

The judgment is reversed.

Van Dyke, J., and Schottky, J. pro tem., concurred.