[Crim. No. 7070. In Bank. May 7, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. DONALD
FLOYD KETCHEL, H. B. SEARS, and THOMAS
EDWARD SEARS, Defendants and Appellants.

508

Christian E. Markey, Jr., Thomas R. McGurrin, and Benjamin Dreyfus, under appointment by the Supreme Court, Garry, Dreyfus & McTernan and Fay Stender for Defendants and Appellants.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and N. Gregory Taylor, Deputy Attorney General, for Plaintiff and Respondent.

TOBRINER, J.—Donald Ketchel, aged 24, Thomas Edward Sears, aged 19, and his brother H. B. Sears, aged 26, were found guilty of robbery in the first degree and murder in the first degree. The jury imposed the death penalty on Ketchel and Thomas Sears; H. B. Sears was sentenced to life imprisonment. The appeals of Ketchel and Thomas Sears are automatic (Pen. Code, § 1239, subd. (b)); H. B. Sears appeals from the judgment, the order denying his motion for a new trial and the order denying his motion for dismissal under Penal Code, section 995. ██ The latter's appeal may properly be considered with the automatic appeals of the joint defendants. (*People* v. *Turville* (1959) 51 Cal.2d 620 [335 P.2d 678].)

We shall explain the reasons for our ruling that the judgment on the issue of guilt of all defendants should be affirmed;

that the judgment of conviction as to H. B. Sears should be affirmed, but that the judgment as to the death penalty as to Ketchel and Thomas Sears should be reversed because of the prejudicial error of the prosecution in urging the deterrent effect of such penalty.

We consider the issues tendered by appellants under the basic divisions of, first, the points urged for reversal as to the main trial on the issue of guilt; second, the points urged for reversal as to the trial on the issue of penalty; third, the contention that the court improperly refused to grant a continuance of the hearing of appellants' motions for a new trial. Since we have concluded that prejudicial error occurred in the trial on the issue of the death penalty imposed upon Ketchel and Thomas Sears, we see no reason to discuss the arguments that this court should reduce that penalty and that such penalty constitutes cruel and unusual punishment in violation of the California and United States Constitutions.

On Friday, June 9, 1961, about 8:45 p.m., Ketchel and Thomas Sears entered the Star Market in Monterey Park. Each held up a cashier at her respective checkstand near the market's entrance. Each stood with his gun in hand as he waited for the cashier to take the money from the cash drawer and put it in a brown paper bag. The two robbers left the market, each carrying his bag of money. They put their guns in their belts, apparently walked rapidly or ran through the parking lot of the market down a public alley leading into Alhambra Street. Both wore slacks, hip-length sports coats, dark glasses and hats. Meanwhile, as soon as the robbers left the checkstands, the cashiers pressed hidden emergency alarm buttons.

George Elder, a policeman of Monterey Park who was off duty and dressed in levis and T-shirt, drove into the parking lot at about the time Ketchel and Thomas Sears were approaching a shed at the end of the parking lot facing Alhambra Street. Elder parked his car, apparently saw the two robbers at some distance under suspicious circumstances, and began chasing them. As he pursued the fleeing robbers, he called out "Hold it" or "Halt," and then, when the two robbers ran between the parked cars and behind the shed, he started firing.

In the melee Ketchel and Thomas Sears separated, darting between the cars. Both were trying to reach the car they had left parked on Alhambra Street some 75 feet distant from the intersection with the alley. Ketchel fired one shot,

which struck Elder and caused him to fall to the street. As he lay there, Elder continued to fire his gun, directing his shot toward the waiting car and the two robbers who were running in that general direction. Ketchel turned into the alley, escaped down the street, and ultimately, on his own, took a cab to the town of Whittier. Thomas Sears reached the waiting car, turned and fired several shots at Elder, and then made his "getaway" in the car.

Elder was struck by two bullets, one from Ketchel's gun and one from Thomas Sears' gun; either shot was sufficient to have brought about his death. One bullet entered Elder's left cheek, cut into his tongue and produced a massive hemorrhage; the other pierced the right lung, proceeded toward the heart, and also produced a hemorrhage. The autopsy surgeon testified that in his opinion Elder did not die immediately from the bullet wounds but remained alive for a short time until the ensuing hemorrhages precluded the continuance of vital body functions. During the interval Elder retained the ability to see, hear and speak.

Several persons witnessed the shooting and surrounding events. One testified that as he stopped to help Elder who was lying in the middle of the street, Elder said, "Star Market hold-up. I have been shot. Three suspects in a '49 Ford. Call the police, call the police, call the police, call the police." Another witness said that when he approached Elder about the same time, Elder mumbled, "I'm okay. Tell them it was a ... blue and white Ford."

Other witnesses, driving from the market, heard the exchange of gunshot, turned around and saw a car speed by them through the approaching darkness without any headlights. Meanwhile the police had received the robbery alarm and began checking cars answering the general description given in the radio call. About 9:30 p.m. that evening the police stopped a maroon-colored 1949 Ford sedan, which was being driven by H. B. Sears and occupied by Thomas Sears. This interception took place 2 miles from the Star Market and a half mile from Sears' apartment. The police searched the car and interrogated the men as to their possession of concealed money or weapons; finding neither, the police, after a 10-minute check, released them both.

The record reveals some conflict as to who, at the time of the crime, June 9, 1961, owned this 1949 Ford car. According to the pink slip, Ketchel, the owner, transferred the car to

H. B. Sears on June 8, 1961, but in subsequent talks with the police H. B. Sears maintained that he did not buy the car from Ketchel until June 11, 1961. On Monday, June 12, 1961, H. B. Sears took the slip to the Department of Motor Vehicles for transfer.

This 1949 car apparently was damaged at the scene of the shooting; one bullet pierced the windshield and another struck and dented the left rear door. The police officers who, on the night of the crime, stopped the car, did not notice the damage to the windshield but did see the dented rear door. H. B. Sears admitted that on Saturday, June 10, he and Ketchel changed the windshield and that, a few days later, he painted the car with a white primer.

Ketchel and H. B. Sears were arrested in Whittier on June 15, 1961. Ketchel voluntarily confessed his part in the crimes but H. B. Sears denied all involvement, maintaining that during the entire evening of June 9 he had been with his girl friend or with his brother Tommy, and had spent a good deal of the time at a bowling alley.

Thomas Sears was apprehended in Phoenix, Arizona, and on June 17, 1961, three California police officers visited him in jail there. At that time he voluntarily made a confession setting forth in some detail the circumstances of the robbery and murder. He stated that H. B. Sears, Ketchel and he had decided on the afternoon of June 9, 1961, to rob a small market. They "cased" the area near their apartment and finally selected the Star Market. H. B. Sears drove the car and about 8:30 p.m. parked on Alhambra Street near the market. Thomas Sears and Ketchel, both carrying guns, left the car, entered and robbed the market. While walking through the parking lot toward the alley leading into Alhambra Street, they heard the shots fired in their direction; they started running. In the fracas Thomas Sears saw Ketchel lean against a tree and thought that he had been shot. Meanwhile Thomas Sears saw a bullet strike the waiting 1949 car, and, thinking that the man firing was trying to shoot his brother, H. B. Sears, in the car, Thomas Sears returned the gunfire, emptying his gun. Thomas Sears then entered the car with his brother H. B. Sears, and they drove from the scene, leaving Ketchel on his own in the street. Later the three met and divided the money (some $954).

The Los Angeles police officers returned with Thomas Sears to Los Angeles. On June 18, 1961, Ketchel, Thomas Sears and H. B. Sears were brought together in a room of the Los

Angeles Sheriff's substation. Three police officers interviewed them for about 20 minutes and then left them alone in the room. The three men discussed the crime; a tape recording was made of their conversation; one of the police officers heard their talk through a loud speaker which was part of the recording equipment. In the conversation, Ketchel said, "I copped out to my part. I copped out to nothing else. They got me cold." H. B. Sears then said, "I've been holding out . . . I didn't know what the hell this was all about. I been holding out on account of you guys. I don't know what this is all about." Ketchel retorted, "I'm dead . . . Somebody's going to get gassed." H. B. Sears replied, "All right. You guys go on. Sign your statement. Get gas. But I've been holding out because I don't know what's going on. They said you killed a man. Well, I didn't kill nobody." As the conversation progressed, Thomas Sears said, "I know you didn't. I told them the truth. I did it man."

At the trial H. B. Sears testified in his own defense. He stated that in the evening of June 9, 1961, he arranged to meet a couple of girls at a bowling alley. While he was driving there with his brother, they were stopped by the police about 9 :30 p.m., the car was searched, and after some 10 minutes checking they were released. Both then returned to their apartment, left the car, and proceeded by taxi to the bowling alley; since the girls did not come they returned about midnight to their apartment.

We turn to an analysis of the points urged by appellants for reversal as to the main trial on the issue of guilt.

1. *The alleged improper admission into evidence of the transcript of the tape recording.*

 a. *The alleged lack of foundation for admission of the transcript.*

 Appellants contend that the trial court erred in admitting into evidence a transcript of a tape recording of the conversation of the three appellants which occurred when they were left alone in a room at the sheriff's substation. They claim that the prosecution did not lay a proper foundation for the admission of the transcript, that its content was unintelligible and that its introduction violated the best evidence rule. We shall explain why we have found no prejudicial error in any of these respects.

 Officer Brown listened to appellants' conversation over a loudspeaker; simultaneously the conversation was tape re-

corded. About a week later Officer Brown, Officer Lawton and a reporter spent approximately three days playing and replaying the recording in an attempt to decipher the tape, identify the voices and distinguish the conversation; they then dictated their findings to the reporter. The recorded conversation lasted 45 minutes or an hour.

At the trial all counsel requested that the trial judge hear the tape and determine the authenticity of the transcript as compared with the tape recording. The trial judge refused, saying, ''I can't make rulings on tape recordings. I have listened to these tape recordings many times . . . most of them are unintelligible, many of them.'' Instead, the trial judge took a copy of the transcript, marked portions that were admissible as purported admissions or confessions, and deleted other portions that consisted of vulgar expressions or profanity.

Officer Brown took the witness stand to verify the transcript. He stated that the transcript correctly represented the conversation that he had heard over the loudspeaker; that he was sufficiently familiar with the voices of the three appellants to be able to distinguish them. He then read from the transcript the marked portions that the trial judge had ruled admissible.

Concededly, as a foundation for its admission, the accuracy of the transcript of a tape recording must first be established. (*People* v. *Wojahn* (1959) 169 Cal.App.2d 135, 146 [337 P.2d 192].) While ordinarily a trial judge will listen to a tape recording to determine the accuracy of the transcription (*ibid.*), this procedure does not constitute the exclusive method for establishing its authenticity. In *People* v. *Wootan* (1961) 195 Cal.App.2d 481 [15 Cal.Rptr. 833], an officer who listened to the conversation at the time of the recording testified that the transcript of the recording accurately reflected the discussion. In the instant case, before the reading of the transcript, Officer Brown testified to its accuracy.

Appellant points out that the force of *Wootan* is weakened by the fact that defendant there testified that the transcription was accurate; we note that the case nevertheless illustrates the use of the officer for that purpose. Appellants also point out that the court in *Wootan* said: ''Inasmuch as the point is not urged on the appeal that the record of the conversation was so incomplete as to be without evidentiary value, we pass that question without discussion.'' (P. 485.)

We do not believe, however, that appellants could successfully demonstrate that the record here is so incomplete as to be without evidentiary value. In short, we cannot find that prejudicial error derives from the fact that the court did not compare the transcript with the recording in a situation in which the officer who actually heard the conversation when it was recorded, testified to the accuracy of the transcript.

Moreover, prior to trial all appellants' counsel listened to the recording; they were accorded a full opportunity to analyze it for discrepancies and to cross-examine officer Brown on any questionable points. After Officer Brown completed his testimony, appellants' counsel heard the recording a second time. None sought to recall Brown for further cross-examination. (*People* v. *Dabb* (1948) 32 Cal.2d 491, 498 [197 P.2d 1].)

Appellants' second objection to the reading of the transcript rests on the ground of the admitted unintelligibility of parts of the recording. The fact, however, that "a recording may not be clear in its entirety does not of itself require its exclusion from evidence, 'since a witness may testify to a part of a conversation if that is all he heard and it appears to be intelligible.' " (*People* v. *Dupree* (1957) 156 Cal.App.2d 60, 68 [319 P.2d 39].) Appellants complain further that the fact that "it took almost three days to decipher . . . an hour tape is an indication that certainly the tape was not clear." Yet that very effort served appellants' interest in insuring the verity of the recording and in isolating material that on first hearing might be inaudible or unclear. (*People* v. *Albert* (1960) 182 Cal.App.2d 729, 742 [6 Cal.Rptr. 473].)

Finally, as to appellants' third contention that the transcript could not be admitted because it was not the best evidence, we have concluded that since recordings or the written transcript of them are "more reliable and satisfactory evidence than testimony of conversations given from memory by those who overheard them" (*People* v. *Stephens* (1953) 177 Cal.App.2d 653, 660 [256 P.2d 1033] ; *People* v. *Wojahn, supra*, p. 146) the transcript was admissible in evidence.

b. *The alleged fraud and trickery in obtaining the tape recording.*

After talking with appellants for some 20 minutes about the crimes charged, the police officers left appellants in the room so they could supposedly talk alone. The room had been wired to record their conversation. Appellants argue

that the deceit of the police officers resulted in the production of statements of appellants that were fraudulently induced and involuntarily rendered, and that as such the statements should have been excluded. If the prosecution could not properly introduce a confession obtained by coercion, appellants contend, the prosecution should not be permitted to adduce admissions procured by fraud and trickery. As to this proposition appellant Thomas Sears recognizes with commendable frankness that "this court has previously indicated otherwise." We proceed to explain why we cannot hold the trial court committed prejudicial error in admitting the evidence.

Only recently in a case in which defendant contended "that the recording was obtained by such fraud that its use as evidence was inconsistent with due process" (*People* v. *Atchley* (1959) 53 Cal.2d 160, 171 [346 P.2d 764]) we said "The deception itself does not render defendant's statements inadmissible, for it was not of a type reasonably likely to procure an untrue statement. (*People* v. *Connelly,* 195 Cal. 584, 597 [234 P. 374]; *People* v. *Castello,* 194 Cal. 595, 602 [229 P. 855].)"

Appellants criticize the distinction drawn in the cited statement between the deception that is "likely to procure an untrue statement," and the converse (cf. *People* v. *Castello* (1924) 194 Cal. 595, 602 [229 P. 855]), contending that the issue turns not upon the possibility of falsehood but upon principles of due process, and that the United States Supreme Court cases adopt the latter approach.

We note, however, that *Atchley,* besides its reference to the effect of the deception upon the truth of the confession, relies upon the absence of mental coercion in the facts before it. Thus in distinguishing *Leyra* v. *Denno,* 347 U.S. 556 [74 S.Ct. 716, 98 L.Ed. 948], the court in *Atchley* says "Although there was a similar deception in the present case, there was no comparable mental coercion." (P. 171.)

In the presence of mental coercion, however, a defendant's confession or admission should not be admissible irrespective of the probabilities that the deception procured an untrue statement. Thus in *Rogers* v. *Richmond* (1960) 365 U.S. 534 [81 S.Ct. 735, 5 L.Ed.2d 760], the United States Supreme Court, in dealing with a situation in which the assistant chief of police pretended that he would bring in the defendant's wife for questioning in order to induce defendant's confession stated: "Our decisions under that Amendment have made clear that convictions following the admission into evi-

dence of confessions which are involuntary, i.e., the product of coercion, either physical or psychological, cannot stand. This is so not because such confessions are unlikely to be true but because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system—a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth.'' (Pp. 540-541.)

We must, then, test the admissibility of the statements ''on the question whether the behavior of the State's law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined—a question to be answered with complete disregard of whether or not petitioner in fact spoke the truth.'' (*Rogers* v. *Richmond, supra,* p. 544.) We shall point out why we find no showing that appellants' will to resist was so overcome here that a coerced confession resulted. Appellants urge that (1) the false statement of the police that defendants were ''free'' to talk, (2) the psychological relationship of Thomas Sears to his brother, and (3) the absence of counsel, served separately or cumulatively, to induce appellants to confess involuntarily and to invalidate the confessions. We cannot, however, strain the facts to fit these projected postulates.

The prior police statements as to the free use of the room could not have been such ''as to overbear [appellants'] will to resist and bring about confessions not freely self-determined'' (*Rogers* v. *Richmond, supra,* p. 544) because appellants themselves suspected their conversations *were* overheard. In the course of their conversations H. B. Sears said ''. . . they've got the . . . tape recorder going'' and Thomas Sears said he wondered ''where they got that . . . bug at.''

We cannot find a realistic basis for appellants' argument that in the emotions of the younger sibling the older brother assumed the role of the father and that the deep need of the child to appeal to the parent for forgiveness served to force appellant's confession here. Even were we to accept appellant's psychological premises, we are confronted with the fact that the older brother participated as a confederate in the very subject matter of the confession and as a consequence could not very well become the father-image to whom the errant child could appeal for ''absolution.''

Nor did anything in the circumstances of the conversations denote any conduct of the police to overcome the will or volition of any of appellants. At the time of the trial Officer Brown, one of the officers who had interviewed and then left appellants alone in the room, testified that their statements were freely and voluntarily made without the use of promises, threats, force or violence. Apparently appellants' counsel, who had been furnished with copies of the transcript and knew the surrounding circumstances, were satisfied with Brown's testimony; they did not cross-examine him on the point. Nor did the police officers attempt to induce the appellants to make any statements, admissions or confessions. (See *People* v. *Ditson* (1962) 57 Cal.2d 415, 435 [20 Cal. Rptr. 165, 369 P.2d 714].)

Finally, the fact that appellants lacked the benefit of the presence of counsel when their conversations occurred did "not of itself" render such confessory statements "inadmissible and in violation of the due process clause of the federal Constitution." (*People* v. *Garner* (1961) 57 Cal.2d 135, 149 [18 Cal.Rptr. 40, 367 P.2d 680].)

2. *The alleged improper admission into evidence of the testimony of the deceased's widow.*

 We find no prejudicial error in the prosecution's calling the deceased's widow, Mrs. Elder, as a witness, or in the alleged cumulative nature of her testimony.

Mrs. Elder testified as to the time her husband left home the evening of June 9, how he was dressed, his carrying a gun, and his state of good health at that time. She could properly testify to facts that she had perceived; her interest in the case did not affect her competency. (Code Civ. Proc., § 1879.) Apparently while on the witness stand Mrs. Elder was somewhat distraught and tearful, but the trial judge observed her conduct and refused to concur in the claims of appellants' counsel that her emotional distress disqualified her. In view of her relevant testimony and the trial judge's ruling, appellants cannot successfully rely upon alleged incidental prejudice created by her appearance.

3. *The alleged error in the instructions on the murder count.*

 The court instructed as follows: "Murder which is committed in the perpetration or attempt to perpetrate robbery is murder of the first degree, whether the killing was intentional, unintentional or accidental." (Pen. Code, § 189.)

"There are two degrees of murder, to-wit, murder in the first degree and murder in the second degree. Ordinarily a defendant may be found guilty of either degree, or may be found not guilty. However, the evidence in this case is such that considering each defendant separately, he is not guilty of the charge of murder or he is guilty of murder in the first degree." "A robbery is still in commission during the continuous integrated attempt to successfully leave with the loot."

Appellants argue that the robbery had terminated by the time that the exchange of shots with Elder transpired. Appellants contend that they shot at an unknown assailant, did not know that he was a police officer since he was not in uniform, and acted only in self-defense. They maintain that the question of whether or not the killing was committed in "one continuous transaction" with the robbery (*People* v. *Chavez* (1951) 37 Cal.2d 656, 670 [234 P.2d 632]) framed an issue which should have been submitted to the jury, and that the trial judge in his instructions to the jury on the felony-murder doctrine improperly removed that issue from it. They further suggest that the jury might have found that Elder acted in haste or without probable cause in firing at the fleeing robbers, and the trial judge erred in not submitting to the jury the alternative issue of second degree murder. (*People* v. *Hudson* (1955) 45 Cal.2d 121, 127 [287 P.2d 497].) Finally they contend that "no matter how weak" their evidence might have been, they were entitled to instructions on their theory of the case. (*People* v. *Carmen* (1951) 36 Cal.2d 768, 773 [228 P.2d 281]; *People* v. *Burns* (1948) 88 Cal. App.2d 867, 871 [200 P.2d 134].)

▮ Appellants, however, do not recognize the fact that "[r]obbery, unlike burglary is not confined to a fixed *locus*, but is frequently spread over considerable distance and varying periods of time. The escape of the robbers with the loot, by means of arms, necessarily is as important to the execution of the plan as gaining possession of the property. (*People* v. *Boss*, 210 Cal. 245, 251 [290 P. 881]; *People* v. *Dowell*, 204 Cal. 109 [266 P. 807].)" (*People* v. *Rye* (1949) 33 Cal.2d 688, 693 [203 P.2d 748].) ▮ A "killing . . . committed in connection with conduct intended to facilitate escape after the robbery and as part of one continuous transaction" constitutes "murder of the first degree by the terms of the statute." (*People* v. *Coefield* (1951) 37 Cal.2d 865,

524

868-869 [236 P.2d 570]; see *People* v. *Kendrick* (1961) 56 Cal.2d 71, 90 [14 Cal.Rptr. 13, 363 P.2d 13].)

Appellants Ketchel and Thomas Sears apparently attempt to bring themselves within the following language of *People* v. *Boss* (1930) 210 Cal. 245 [290 P. 881], at pages 250-251: "It is a sound principle of law which inheres in common reason that where two or more persons engage in a conspiracy to commit robbery and an officer or citizen is murdered while in immediate pursuit of one of their number who is fleeing from the scene of the crime with the fruits thereof in his possession, or in the possession of a co-conspirator, the crime is not complete in the purview of the law, *inasmuch as said conspirators have not won their way even momentarily to a place of temporary safety* and the possession of the plunder is nothing more than a scrambling possession. In such a case the continuation of the use of arms which was necessary to aid the felon in reducing the property to possession is necessary to protect him in its possession and in making good his escape." (Italics added.) But under the evidence these appellants had not reached a place of *temporary safety* when, as they were crossing the market's parking lot after the robbery, Elder called "Halt" and then started firing his gun; they in turn sought cover among the parked cars and returned his gunfire as they desperately tried to reach their own waiting car on the adjoining street.

Two witnesses testified that they saw the two robbers run out of the store towards the shed, which was in the corner of the alley in the rear of the market and Alhambra Street; another witness testified that he saw the robbers "kind of rapidly walking" across the parking lot and about "halfway through the lot" they were "in a running state." Ketchel admitted to the police officers that "I reached the end of the alley and I heard some man yell 'Hold it.' He was running and I ducked behind a car at that time." Thomas Sears stated to the police officers that "when they reached the alley . . . he heard a shot and he started running for the car. . . . There was a man in the street shooting towards the car"; and Sears said he "began shooting back. . . ."

Manifestly the robbery was still continuing when Elder was killed. "The law of this state has never required proof of a strict causal relationship between the felony and the homicide. The statute [Pen. Code, § 189] was adopted for the protection of the community and its resi-

dents, not for the benefit of the lawbreaker, and this court has viewed it as obviating the necessity for, rather than requiring, any technical inquiry concerning whether there has been a completion, abandonment, or desistence of the felony before the homicide was completed." (*People* v. *Chavez, supra,* pp. 669-670.)

Nor does the evidence permit the argument that, since Ketchel and Thomas Sears did not know that Elder was a police officer, they were entitled to fire at him as an assailant. ▮ "Where a party is apprehended in the commission of an offense, or upon fresh pursuit afterward, notice of the official character of the person" attempting "the arrest is not necessary, because he must know the reason why he is apprehended. . . . 'the circumstances are sufficient notice.' " (*People* v. *Pool* (1865) 27 Cal. 572, 576-577.)

▮ To insulate the robbery from the events immediately following it, and thereby to maintain that the two appellants had reached a place of safety, severing their subsequent conduct from the robbery, is artificially to bifurcate, in disregard of the evidence, the conduct of the appellants. The jury could not reasonably find the facts which would support a judgment for second degree murder.

The "giving of instructions not justified by the facts of the case" tends "to overburden and confuse the jurors." (*People* v. *Wade* (1959) 53 Cal.2d 322, 333 [1 Cal.Rptr. 683, 348 P.2d 116].) Here the evidence established as a matter of law that the robbery was still in progress when Elder was shot; the evidence would not sustain any other construction of the facts; under Penal Code, section 189, the trial court properly instructed the jury that appellants were either guilty of first degree murder or not guilty of murder at all. (*People* v. *Sanford* (1949) 33 Cal.2d 590, 595 [203 P.2d 534]; *People* v. *Waller* (1939) 14 Cal.2d 693, 703 [96 P.2d 344].)

4. *The alleged error in the rulings on the status of decedent Elder and the validity of his action as an arresting officer.*

▮ The evidence did not clearly evince whether Elder was or was not on duty at the time he apprehended Ketchel and Thomas Sears in the parking lot. The judge finally ruled that Elder's status, on or off duty, did not materially affect the question of "whether there was a homicide." The judge also ruled that Elder as a matter of law had the right at all times to carry a concealed weapon, a gun. (Pen. Code, § 12027.)

Appellants argue that when Elder started firing at the robbers crossing the parking lot he could not possibly have known that a robbery had been committed. The court instructed the jury on the code requirements for a peace officer's arrest without a warrant: "(1) Whenever he has reasonable cause to believe that the person to be arrested has committed a public offense in his presence; (2) when a person arrested has committed a felony, although not in his presence; (3) whenever he has reasonable cause to believe that the person to be arrested has committed a felony, whether or not a felony has in fact been committed." (Pen. Code, § 836.) "[A]n arrest will not be held to have been validly made even though the arrested person was guilty of having committed a felony unless the arresting officer had reasonable grounds as a basis for making the arrest." (*People* v. *Dupee* (1957) 151 Cal.App.2d 364, 366 [311 P.2d 568]; *People* v. *Brown* (1955) 45 Cal.2d 640 [290 P.2d 528].)

 In the instant case we have pointed out that two witnesses testified that the robbers either rapidly walked or ran from the market through the parking lot with sacks containing the loot. They had on dark glasses at night and they wore hip-length sports coats. Elder must have surmised that they were robbers for he called to them to "Halt" before firing; as he was dying he gasped to eyewitnesses of the shooting fray, "Star Market holdup. I have been shot. Three suspects in a '49 Ford." Elder, of course, was not alive to testify as to what action on the part of the fleeing robbers aroused his suspicion. But "[e]ach case depends upon its own circumstances. . . . Justice White in *People* v. *Ingle* (1960) 53 Cal.2d 407, 412 et seq. [2 Cal.Rptr. 14, 348 P. 2d 577], has set forth the test: 'Reasonable or probable cause for an arrest has been the subject of much judicial scrutiny and decision. There is no exact formula for the determination of reasonableness. Each case must be decided on its own facts and circumstances [citations]—and on the total atmosphere of the case. [Citations.] Reasonable cause has been generally defined to be such a state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime. [Citations.]' " (*People* v. *Crowley* (1961) 193 Cal.App.2d 310, 313-314 [14 Cal.Rptr. 112].)

5. *The alleged error in the admission of autopsy surgeon's testimony.*

Appellants argue that the autopsy surgeon lacked the qualifications to testify either as to Elder's ability to talk or respecting his perceptive powers after being shot. In this respect they rely upon the fact that the surgeon had never treated a live person for a bullet wound.

The doctor testified that he had occupied his present position in Los Angeles County since 1955; he recounted his years of medical training and experience. When asked specifically about the immediacy of Elder's death, he responded that in his opinion Elder lived for a period of time until he bled to death from the hemorrhages and that, despite the bullet injury to his tongue and part of the lingual nerve, he would have been able to speak. This testimony involved the observations of the autopsy surgeon as to the cause of Elder's death, reflecting the surgeon's training in pathology rather than his ability to treat a living person for a bullet wound.

Generally it is for the trial court, in the exercise of its discretion, ''to determine the competency and qualification of a witness to state an opinion.'' (*People* v. *Haeussler* (1953) 41 Cal.2d 252, 261 [260 P.2d 8].) The fact that the surgeon had not treated living persons would reach only to the weight of his testimony. The members of the jury were ''not bound by'' his opinion but were ''free to determine the weight to which it was entitled and to disregard it if they found it to be unreasonable,'' and they were so instructed. (*People* v. *Cole* (1956) 47 Cal.2d 99, 104-105 [301 P.2d 854, 56 A.L.R.2d 1435].)

6. *The alleged error in the cumulative use of diagram of the market area.*

At the beginning of the trial, the court, in the exercise of its discretion, granted defense motions for exclusion of witnesses. (Code Civ. Proc., § 2043; *People* v. *Lariscy* (1939) 14 Cal.2d 30, 32 [92 P.2d 638].) During the trial several witnesses for the prosecution used the same diagram of the market area and the parking lot which previous witnesses had marked in the course of their testimony. Appellants argue that the trial court's permission successively to use the diagram circumvented the exclusionary order since the chalk marks by one witness ''could not help but have an influential and suggestive'' effect upon subsequent witnesses in their marking of relevant spots on the diagram to illustrate their testimony. (Cf. *People* v. *Kynette* (1940) 15 Cal.2d 731, 755-756 [104 P.2d 794].)

In exercising its discretionary power in excluding witnesses, the trial court may consider the practicalities of the situation (see *People* v. *Persky* (1959) 167 Cal.App.2d 134, 139 [344 P.2d 219]) or ''may grant a motion to exclude witnesses but permit certain of them to remain'' (*People* v. *Carella* (1961) 191 Cal.App.2d 115, 142 [12 Cal.Rptr. 446]). The trial court's limited relaxation of its exclusionary order in its permission to witnesses to use the same diagram rested within its sound discretion. (Code Civ. Proc., § 2043.)

Moreover, the record exhibits no flagrant misuse of the diagram in portraying the various marks of the successive witnesses. Each witness placed his own designation upon the diagram to indicate the particular location of the person, thing or event about which he testified; in most cases nothing exhibited to the following witnesses the representations intended by the marks; the identity of a particular mark was only noted for such permanent items as a telephone pole; each witness used a different coloring device in order to obviate any confusion as to the markings; in the event appellants' counsel so requested, the witness was provided with a fresh unmarked diagram to use for illustrative purposes. Finally, violation of the order of exclusion of witnesses through any such purported improper use of the diagram would not affect the credibility of the witness, nor the competency of the witness or the admissibility of the witness' testimony. (*People* v. *Duane* (1942) 21 Cal.2d 71, 80 [130 P.2d 123]; *People* v. *Tanner* (1947) 77 Cal.App.2d 181, 187 [175 P.2d 26].)

7. *The alleged denial of an unbiased, impartial jury.*

Appellants argue that the trial court improperly excused prospective jurors and that in other instances, the prosecuting attorney improperly interrogated the jurors on *voir dire*. Although we recognize that '' '[t]he right to unbiased and unprejudiced jurors is an inseparable and inalienable part of the right to a trial by jury guaranteed by the constitution.' '' (*People* v. *Elliot* (1960) 54 Cal.2d 498, 504 [6 Cal.Rptr. 753, 354 P.2d 225], quoting from *Lombardi* v. *California St. Ry. Co.* (1899) 124 Cal. 311, 317 [54 P. 66]; *People* v. *Hughes* (1961) 57 Cal.2d 89, 97 [17 Cal.Rptr. 617, 367 P.2d 33]), we find no violation of that right in the procedure of the trial court in the case before us.

At the beginning of the *voir dire* examination the trial court asked the first 12 prospective jurors: ''Now, is there anybody in the jury box that has certain beliefs or dis-

beliefs or scruples or in any way an opinionation or fixation that would prevent you from voting for the death penalty simply because of the fact that it is the death penalty?" Four of the jurors raised their hands in reply. The court asked for a stipulation of counsel that they be excused; counsel refused; the court excused these four jurors on its own initiative.

Under our statutory scheme, an important factor affecting the qualification of jurors in cases in which "the offense charged be punishable with death" (Pen. Code, § 1074, subd. 8) lies in whether their determination of guilt would be affected by their views of capital punishment. Such views should not obviate a meaningful choice between the alternative penalties of death and life imprisonment. (*People* v. *Riser* (1956) 47 Cal.2d 566, 573-576 [305 P.2d 1].) In this respect the court may excuse a juror on its own motion. (Pen. Code, § 1089; *People* v. *Green* (1956) 47 Cal.2d 209, 215-216 [302 P.2d 307].) The determination whether a juror has shown that he entertains "conscientious scruples against conviction where the penalty is death" and to refuse further examination on the point (*People* v. *Goldensen* (1888) 76 Cal. 328, 346 [19 P. 161]) reposes within the discretion of the court. The court did not abuse its discretion here in directing its questions to the four prospective jurors or in determining that they were disqualified.

▮▮▮ Appellants further argue that the prosecuting attorney in his interrogation of prospective jurors as to the death penalty confused them by referring to "the Chessman situation" and by intimating that any hostility at all to the death penalty established a ground for disqualification. The record, however, reflects no misleading interrogation but only the prosecutor's exercise of his right "in a case where the death penalty may be imposed . . . to ascertain the views of the potential jurors [citations] so that he can intelligently exercise his challenges against those whose consciences would preclude them from imposing this penalty." (*People* v. *Wein* (1958) 50 Cal.2d 383, 394 [326 P.2d 457].) The only instance of alleged confusion to which appellants refer involves a prospective juror whose state of mind was questioned by a defense counsel. The trial court properly queried this juror upon her attitude toward the death penalty; we find no connection between this incident and the prosecuting attorney's reference to the "Chessman situation."

Finally, appellants do not allege unfairness or partiality on the part of the jurors who were impaneled. "When it appears that a fair and impartial jury was obtained, it is the general rule that an error of the court in allowing a challenge and permitting a juror to be excused is not subject to review." (*People* v. *Durrant* (1897) 116 Cal. 179, 199 [48 P. 75].)

8. *The alleged prejudicial misconduct in prosecuting attorney's argument.*

 In his closing argument to the jury, one of the prosecuting attorneys referred to Officer Brown's testimony regarding the tape recording and commented that some "inflammatory" portions were "removed" and only those portions having "probative value" were introduced. When appellants' counsel objected to the descriptive term "inflammatory," the prosecuting attorney apologized for having so used the word and joined appellants' counsel in asking that the comment about "inflammatory statements" be stricken; the trial court so ordered and told the jury to disregard it. Moreover, in order to clarify the situation, the prosecuting attorney explained that by the use of the word "probative" he meant to convey that only those parts of the tape recording bearing on the case were used. Under such circumstances no prejudicial error occurred. (*People* v. *Bradbury* (1907) 151 Cal. 675, 678-679 [91 P. 497].)

9. *Ketchel's specific argument: the prosecuting attorney's comment on Ketchel's failure to take the witness stand.*

 In his closing argument the prosecuting attorney stated that if Ketchel were "not guilty of murder, and if he is not guilty of robbery," he "should take the stand and say, 'I didn't do it, I didn't do it.'"

Penal Code section 1323 permits the defendant in a criminal case to choose whether or not he shall appear as a witness at his trial. Counsel may comment on the failure of a defendant to take the witness stand and "explain or deny . . . any evidence of facts in the case against him." (Cal. Const., art. I, § 13; *People* v. *Perry* (1939) 14 Cal.2d 387, 394-395 [94 P.2d 559, 124 A.L.R. 1123].) Moreover, appellant did not object to the attorney's remark when it was expressed, nor did he ask the trial court to instruct the jury to disregard it. (*People* v. *Robillard* (1960) 55 Cal.2d 88, 102 [10 Cal. Rptr. 167, 358 P.2d 295].)

10. *H. B. Sears' specific arguments.*

a. *The alleged insufficiency of the evidence to support a verdict of robbery and first degree murder.*

█ The record doees not sustain H. B. Sears' argument that the verdict of robbery and first degree murder does not find substantiation in the evidence.

While it is true, as H. B. Sears states, that no one saw him at the scene of the shooting, he, himself, admits that the record shows that the dying Elder made two statements to different persons at different times concerning a Ford automobile. One such statement was ''Star Market holdup. I have been shot. Three suspects in a 1949 Ford.'' The other was ''Be sure and tell them it was a 1958 blue and white Ford Victoria.'' Many witnesses placed the Ford at the scene of the robbery. The pink slip stated that H. B. Sears purchased the Ford on June 8, 1961; indeed, the date on the slip was in H. B. Sears' handwriting. H. B. Sears stated ''Nobody drives my car but me.'' Within a half hour of the shooting, two Montebello policemen stopped H. B. Sears driving the 1949 Ford about 2 miles from the Star Market. His brother, Thomas Sears, was a passenger in the car.

At the time of the shooting bullets passed through the windshield of the Ford and damaged both the windshield and the door. On June 10, 1961, H. B. Sears helped replace the windshield; during the next week he had the car repainted.

While other references in the transcript implicate H. B. Sears, we cite the above instances as illustrative. They suffice to meet the appellate test that we search only for substantial evidence to support the conclusion of the trier of fact (*People* v. *Daugherty* (1953) 40 Cal.2d 876, 885 [256 P.2d 911]) and that every fact reasonably deducible from the evidence must be assumed in favor of the judgment. (*People* v. *Caruso* (1959) 176 Cal.App.2d 272, 276 [1 Cal. Rptr. 428]; *People* v. *Dills* (1959) 171 Cal.App.2d 256 [340 P.2d 273].)

b. *The alleged erroneous denial of motion to dismiss.*

█ The trial court denied H. B. Sears' motion to dismiss the indictment for lack of probable cause (Pen. Code, § 995); this order is not appealable (see Pen. Code, § 1237; *People* v. *Alcala* (1959) 169 Cal.App.2d 468, 472 [337 P.2d 558]) but the propriety of the dismissal may be considered on an appeal from the judgment of conviction (Pen. Code, § 1259; *People* v. *Simmons* (1897) 119 Cal. 1, 2 [50 P. 844]).

 Appellant based the motion on the ground that no competent evidence demonstrated that he had committed robbery and murder. "Probable cause is shown if a man of ordinary caution or prudence would be led to believe and conscientiously entertain a strong suspicion of the guilt of the accused. (*People* v. *Nagle,* 25 Cal.2d 216, 222 [153 P.2d 344].) An indictment will not be set aside or a prosecution thereon prohibited if there is some rational ground for assuming the *possibility* that an offense has been committed and the accused is guilty of it." (*Bompensiero* v. *Superior Court* (1955) 44 Cal.2d 178, 183-184 [281 P.2d 250], emphasis added; see also *Weber* v. *Superior Court* (1950) 35 Cal. 2d 68, 69 [216 P.2d 871].) "If there is some evidence to support the indictment, the courts will not inquire into its sufficiency. . . ." (*Lorenson* v. *Superior Court* (1950) 35 Cal.2d 49, 55 [216 P.2d 859] ; *Greenberg* v. *Superior Court* (1942) 19 Cal.2d 319, 322 [121 P.2d 713].)

 The grand jury transcript shows that an eyewitness to the shooting testified that he heard the dying Elder state, "Three suspects in a '49 Ford." About half an hour later the police stopped the Ford car that H. B. Sears was driving with his brother Thomas Sears as a passenger some 2 miles from the Star Market; the car was searched and the police interrogated the two men. The testifying officer stated that the car was a deep maroon, that he did not notice any bullet holes or damage to the car but that his duty was to watch "the hands and . . . movements of the suspects." The Deputy Sheriff for Los Angeles County, an investigating officer in the case, testified that the records of the Department of Motor Vehicles showed that the 1949 Ford here involved was registered on June 9, 1961, the date of the robbery, to Donald Ketchel but that in an interview with H. B. Sears on June 17 following his arrest, Sears in a free and voluntary statement said that he had bought the Ford from Ketchel on June 7, that it had been in his possession since that time and that no one had driven it but himself. From this testimony the grand jury could conscientiously suspect that H. B. Sears was the driver of the "getaway" car in the Star Market robbery and thus was connected with the crimes charged.

c. *The alleged improper denial of motion for separate trial.*

 Prior to commencement of the joint trial appellant H. B. Sears moved that he be tried separately because statements by his codefendants, particularly his brother Thomas

Sears, implicated him in the crimes charged; the statements would be admissible at a joint trial as to the codefendants making them; and they would be highly prejudicial to H. B. Sears.

The granting of a motion for separate trial lies within the trial court's discretion. (Pen. Code, § 1098.) "A severance may be properly denied where there is a common element of substantial importance in the commission of the crimes. It will not be granted because damaging testimony or confession of a codefendant might be admitted." (*People* v. *Cohen* (1951) 107 Cal.App.2d 334, 342 [237 P.2d 301]; see also *People* v. *King* (1938) 30 Cal.App.2d 185, 206 [85 P.2d 928].) The "common element of substantial importance" here is that all three defendants were charged with committing the two crimes alleged in the indictment. (Cf. *People* v. *Spates* (1959) 53 Cal.2d 33, 36 [346 P.2d 5]; *People* v. *Chapman* (1959) 52 Cal.2d 95, 97 [338 P.2d 428].) We find no abuse of discretion. (*People* v. *Eudy* (1938) 12 Cal.2d 41, 45-46 [82 P.2d 359].)

d. *The alleged erroneous admission of codefendant's confession.*

A police officer testified as to the confession of Thomas Sears that was rendered out of the presence of H. B. Sears. In this confession Thomas Sears stated that his brother H. B. Sears "joined he and Ketchel" after they told H. B. Sears their robbery plans; that they all three left "in a car which had been purchased by the defendant H. B. Sears from the defendant Ketchel." Thomas Sears further stated to the officer that Sears fired at Elder because Sears "saw a bullet strike the car, the 1949 Ford, and he thought the man was trying to shoot his brother"; that he "got into the car and that he and the defendant H. B. Sears drove from the scene."

"[E]vidence of a confession or admission by one of several co-defendants is admissible under proper instructions limiting its consideration to the declarant, even though such evidence includes statements which tend to incriminate the codefendants." (*People* v. *Pickens* (1961) 190 Cal.App.2d 138, 148 [11 Cal.Rptr. 795]; see also *People* v. *Turville, supra* (1959) 51 Cal.2d 620, 636; *People* v. *Rhinehart* (1961) 196 Cal.App.2d 240, 241-242 [16 Cal.Rptr. 391].) Here on four different occasions the court instructed the jury that it could not consider Thomas Sears' confession in determining H. B. Sears' guilt or innocence. When "the

statements are relevant to the defendant and the jury is instructed the evidence is admitted only as to him, it will ordinarily be presumed that the jury followed the instruction and that there was no prejudice as to the codefendant.'' (*People* v. *Chavez* (1958) *supra*, 50 Cal.2d 778, 790.)

e. *The alleged improper consideration of payroll records.*

The prosecution called the office manager of appellant's place of employment to establish by the payroll records that appellant H. B. Sears did not work on June 9, 1961, the day of the robbery, nor any time thereafter. Appellant's counsel objected that the prosecution failed to lay a proper foundation for introduction of the records. (Code Civ. Proc., § 1953f.) The court overruled the objection. On cross-examination, appellant's counsel supplied the omission in the proper identification of the records; and then on presentation of the defense, he used the same records. The present objection to the admission of such payroll records cannot stand. (See *People* v. *Gorgol* (1953) 122 Cal.App.2d 281, 294 [265 P.2d 69].)

The trial court permitted the office manager to testify to the contents of the records as shown by the documents themselves rather than requiring their admission under the best evidence rule. (Code Civ. Proc., § 1855.) But the "records were in court for use on cross-examination. or otherwise" (*Margolis* v. *Teplin* (1958) 163 Cal.App.2d 526, 533 [329 P.2d 535]) so that any purported error in her testimony could be clarified or corrected as appellant might desire.

The court did not allow appellant to show as extensively as he wished the work schedule of his fellow-employees on June 9, 1961, or the week thereafter. The office manager who was called by appellant's counsel, established that, as of such date, work was slow at appellant's place of employment and that the payroll records reflected generally that no one worked on June 9 or the next few days thereafter. Then appellant's counsel began a line of inquiry as to whether particular individuals worked on specific days; the trial court sustained objections to this kind of testimony on the ground that it opened up too "many collateral issues." (Code Civ. Proc., § 1868; *Decter* v. *Stevenson Properties, Inc.* (1951) 39 Cal.2d 407, 420 [247 P.2d 11].) It was the prosecution's theory that appellant did not work on June 9 nor thereafter because of his involvement in the plans for the robbery and his avoidance of arrest. The

court permitted H. B. Sears to rebut that inference by showing on his defense that his absence from work could be due to a slow work season. Under the circumstances it does not appear that the trial court's rulings in regard to the payroll records prejudiced appellant.

### f. The alleged erroneous admission of accusatory statements which appellant denied.

 At the trial a police officer testified as to his conversation with appellant H. B. Sears on June 16 soon after his arrest. Appellant gave his statements freely and voluntarily. After appellant denied any knowledge as to the reasons for his arrest, the police officer told him that they were investigating the June 9 market robbery and homicide in Monterey Park and that they had been informed that the 1949 Ford car appellant owned was used at the time. Appellant replied, ''Well, it wasn't me and it wasn't my car.''

Appellant's counsel objected to the testimony upon the ground that it consisted of hearsay and that, since appellant denied the accusation, the statements were not admissions and there was ''no justification for [their] introduction in evidence.'' (*People* v. *Bracamonte* (1961) 197 Cal.App.2d 385, 388 [17 Cal.Rptr. 62]; see *People* v. *Simmons* (1946) 28 Cal.2d 699, 712-721 [172 P.2d 18]; *People* v. *Davis* (1954) 43 Cal.2d 661, 669-672 [276 P.2d 801].) The court overruled the objection; the officer continued with his testimony, relating further queries of appellant as to his whereabouts and appellant's response, ''I don't know what this is all about. I don't want to talk any more until I see an attorney.'' Again appellant's counsel objected; the objection was overruled; the officer continued with further testimony as to his interrogation of appellant regarding the condition of the car. The officer testified that he had asked appellant whether he had repaired the damage to the car and that appellant had denied so doing; the officer further attested his final query ''whether anyone else could have been driving the car or had he loaned it to someone.'' The officer stated that appellant responded ''No. Nobody drives my car but me.''

 If a defendant indicates he does not want to discuss the matter under a claim of right to which he is legally entitled until he has the advice of counsel, the admission of the statements into evidence constitutes error. (Cf. *People* v. *Abbott* (1956) 47 Cal.2d 362, 373 [303 P.2d 730].)

 The People first argue that appellant's statement that no one drove his car but himself was admissible as an admission of guilt because the pink slip on the car indicated that appellant had purchased the car from Ketchel on June 8, and the car was driven from the scene of the robbery and homicide on June 9. The prosecution then contends that if part of a conversation is reported, the entire conversation becomes admissible so long as all parts of it are relevant to each other.

 In *Rosenberg* v. *Wittenborn* (1960) 178 Cal.App.2d 846 [3 Cal.Rptr. 459], the court said at page 852: "In the event a statement admitted in evidence constitutes part of a conversation or correspondence, the opponent is entitled to have placed in evidence all that was said or written by or to the declarant in the course of such conversation or correspondence, provided the other statements have some bearing upon, or connection with, the admission or declaration in evidence and are not excluded by a rule of law other than the hearsay rule." Here, if the People had not brought out the entire conversation, appellant H. B. Sears on cross-examination would have been entitled to do so. (Code Civ. Proc., § 1854; *People* v. *Whitehead* (1952) 113 Cal.App.2d 43, 49 [247 P.2d 717].)

We turn to the consideration of the issues at the trial on the penalty. We consider each of the arguments seriatim.

1. *The argument of the prosecuting attorney on the deterrent effect of the death penalty.*

 We believe that the prosecutor's argument to the jury that the death penalty was a deterrent to crime constituted prejudicial error in the penalty phase of the case.

The placement of the deterrent argument in the structure of the opening statement of the deputy district attorney gave it special impact. In the preliminary portion of his argument he explained that "the Adult Authority has the power after seven calendar years of releasing a first degree murderer on parole." He thereafter returned to this theme with the statement "[I]f you decide that the proper punishment here is life imprisonment, this is, in effect, your endorsement to say, 'These men can be rehabilitated,' and you're telling the Adult Authority, 'When you see fit, when you think and agree with us that he has been rehabilitated, release him.' This is what your endorsement will mean. And if you say, 'Life imprisonment,' these men will once again walk the streets."

The prosecution argued to the jury that they had a "responsibility towards the deterrents of crime" that "we must show an example," that "we cannot allow the luxury to these other potential killers of saying that our jurors are soft and our laws are soft." The prosecutor asserted that the defendants were kept in "the County Jail upstairs"; that it "has about 3,000 inmates . . . that have broken the law. . . . These are our potential robbers and murderers of the future."

Developing his theme of deterrence, the prosecuting attorney stated, among other similar matters, the following: ". . . I submit to you that the robbers and killers of the future were the classmates of these defendants; those people in the County Jail, those people in the Youth Authority, those people in State Prison under the Adult Authority. These are the people that we must deter. We must show an example under the proper circumstances. We cannot allow the luxury to these other potential killers of saying that our jurors are soft and our laws are soft.

". . . How much of a deterrent can we put on robbers not to put bullets into their guns? How much of a deterrent can we put on them maybe not to even commit the crime at all? Because this is a terrible and a violent crime. Can we deter not only these defendants from future crimes but other persons from pulling the trigger when they are about to be captured?

"And there are many, many people, potential killers and robbers, that are going to watch and see what you do. Protection of society, deterrents of crime, are factors, ladies and gentlemen, that you must consider. . . .

". . . the two big issues that you have here, considering the defendants as individuals, considering the deterrents of crime, deterrents of a robber who will figure that juries are soft. You must consider the deterrents not only from the standpoint of these individual defendants but from other persons."

In *People* v. *Love* (1961) 56 Cal.2d 720 [16 Cal.Rptr. 777, 17 Cal.Rptr. 481, 366 P.2d 33, 809], we reversed a judgment imposing the death penalty because of the prosecutor's reliance upon the argument that capital punishment was a more effective deterrent than imprisonment. In that case the substance of the prosecution's argument was that "callous, hardened criminals . . . say they know that the law says that if they kill someone while they are in that robbery, or that burglary, that they will get the death penalty, and therefore

thinking and reflecting on that, even while they commit their crimes, they unload their guns and as insurance against not getting the death penalty. . . . In other words if there were no death penalty, if jurors did not exercise their sound discretion in a proper case such as this and inflict it and have the courage to inflict it, it would be better for a burglar or murderer or someone committing a crime to take a chance and kill someone. . . .'' (Pp. 729-730.)

We held the argument constituted prejudicial error, saying, ''The Legislature has left to the absolute discretion of the jury the fixing of the punishment for first degree murder. (*People* v. *Green,* 47 Cal.2d 209, 232 [302 P.2d 307] ; *People* v. *Friend, supra,* pp. 767-768 [47 Cal.2d 749 (306 P.2d 463)].) There is thus no legislative finding, and it is not a matter of common knowledge, that capital punishment is or is not a more effective deterrent than imprisonment. Since evidence on this question is inadmissible, argument thereon by prosecution or defense could serve no useful purpose, is apt to be misleading, and is therefore improper.'' (*People* v. *Love, supra,* p. 731.)

The gist of *Love* is that an appeal to the jury based upon the alleged superiority of capital punishment over imprisonment reaches into the improbable and unknown. Evidence which sought to prove such an hypothesis would not be admissible. The argument founded upon it must be erroneous, and, in certain circumstances, prejudicial.

The argument in the instant case in part parallels the prejudicially erroneous supplication of the prosecutor in *Love.* It echoes the argument of *Love* that ''criminals'' will ''unload their guns'' in order not to get the death penalty with the plea that the jurors must fix their penalty in light of ''how much of a deterrent can we put on robbers not to put bullets into their guns?''

The prosecutor's argument here in part actually proceeds beyond that of *Love.* The argument addresses the minds of the jury to the deterrence of designated ''potential killers'' rather than to the penalty to be adjudged to the defendants. It specifies and describes the persons who are to be ''deterred''; it personalizes these ''potential killers'' in the fictitious identities of ''the classmates of these defendants: those people in the County Jail, those people in the Youth Authority, those people in the State Prison under the Adult Authority. These are the people that we must deter.'' The sought imposition of the death penalty thus rests upon the

unproven and illegitimate assumption that it acts as a deterrent to the described "potential killers." The prosecution, indeed, twice emphasizes the contention: "We cannot allow the luxury to these other potential killers of saying that our jurors are soft and our laws are soft." The warning of the prosecution injected a false and foreign weight in the scale of the rendition of a delicate, crucial decision.

We find no evidence in the record to the effect that "potential robbers and murderers" were "going to wait and see what" the jury did in this case. Nor is there any evidence to show that the death penalty deters "persons from pulling the trigger when they are about to be captured." Surely no evidence could prove that "3,000 people in the County Jail that have broken the law that are either being sentenced there or *awaiting trial* . . . are our potential robbers and murderers of the future." (Italics added.) Indeed, no evidence supports the plethora of insinuation and implication of the deterrence of the death penalty implicit in the prosecution's argument. Moreover, as we have stated, such evidence, even if offered, would not have been admissible.

*Love*, and cases subsequent to it, permit no such emphatic presentation to the jury of the unproven contention of the superiority of the deterrence of the death penalty. Thus in *People* v. *Lane* (1961) 56 Cal.2d 773 [16 Cal.Rptr. 801, 366 P.2d 57], the court's instructions included a single reference, among many other factors, to "accord weight to the consideration of the several objectives of punishment, *of the deterrence of crime*. . . ." (P. 786.) As the court pointed out, the words ". . . do not suggest any opinion of the court that one penalty is a greater deterrent than the other; and while they should have been omitted, we do not believe that this single casual reference to 'deterrence of crime' was prejudicial to defendant." (P. 787.)

*People* v. *Garner* (1961) 57 Cal.2d 135, 156 [18 Cal.Rptr. 40, 367 P.2d 680], involved an argument of the district attorney as to deterrence, but the court, having examined the record, "concluded that his discussion of the deterrent effect of the death penalty was only a minor part of his appeal to the jury for that penalty." Finally, in *People* v. *Imbler* (1962) 57 Cal.2d 711, 717-718 [21 Cal.Rptr. 568, 371 P.2d 304], the court characterized as error, but not prejudicial error, the prosecutor's argument to the jury as to the deterrent effect of the death penalty. The court said, "The prosecu-

tor's discussion in that regard, offered to the jury as 'another factor you can consider,' was temperate and restrained and was only a brief and minor part of his argument. The error was therefore not prejudicial. (*People* v. *Garner, ante,* pp. 135, 156 [18 Cal.Rptr. 40, 367 P.2d 680].)''

In the instant case the reference did not find its sole embodiment in an instruction to the jury; it was not a minor part of the appeal; it was not temperate and restrained. In substance, it was the expression of a basic thrust of the prosecutor to obtain a verdict for capital punishment because of its alleged deterrent effect. According to the prosecutor, ''the two big issues'' before the jury were consideration of the defendants as individuals and deterrence of future robbers ''who will figure that juries are soft.''

It is true, as respondent points out, that the contention does not appear on every page of the transcript and that its quantitative volume is limited, but it runs as a thread deeply woven in the impact of the whole argument. As to its prejudicial effect, we quote the language of *Love*: ''. . . we are convinced that it is 'reasonably probable that a result more favorable' to defendant 'would have been reached in the absence of error' and that accordingly the error is prejudicial. (*People* v. *Watson,* 46 Cal.2d 818, 836 [296 P.2d 243].)'' (P. 733.)

In sum, to accept the legality of the prosecution's argument in this case would be to erase the principle of *Love*.

2. *The alleged improper reference to appellants as "cop-killers."*

In his argument the prosecuting attorney referred to the deceased as a policeman and to appellants as "cop-killers," although the prosecution did not show that appellants knew the victim to be a police officer. At the time appellants made no objection to this claimed impropriety. (*People* v. *Johnson* (1958) 163 Cal.App.2d 58, 62 [328 P.2d 809].) It is not disputed that at the time of his death Elder was a policeman for the City of Monterey Park; hence, the challenged statement as to his occupation is factually correct. (*People* v. *Linden* (1959) 52 Cal.2d 1, 21 [338 P.2d 397].) Nor upon the record can it be said that use of the term "cop-killers" constituted error; the evidence sustains such a description, despite its flamboyant character. (See, for instance, *People* v. *Hardenbrook* (1957) 48 Cal.2d 345, 352 [309 P.2d 424], references to "mother-killer" and "sneaky" mother-killer.)

■ "In the argument before the jury, any reasonable inference may be drawn from the evidence, and it is a matter within the discretion of the trial court to determine whether counsel stays within the permissible range of discussion." (*People* v. *Simpson* (1954) 43 Cal.2d 553, 570 [275 P.2d 31]; *People* v. *Eggers* (1947) 30 Cal.2d 676, 693 [185 P.2d 1].)

3. *The arguments of Ketchel as to specific improprieties affecting him at the penalty trial.*

a. *Impropriety of the trial court's instructions as to a prisoner's release from prison after sentence.*

■ The court instructed: "In making your determination as to the penalty to be imposed, the jury may, in exercising its discretion to choose between different punishments, consider as a possible consequence that the law of this State provides that a defendant sentenced to either death or life imprisonment may be pardoned or have his sentence reduced by the Governor and that a prisoner serving a life sentence may be eligible for parole but not until he has served at least seven calendar years."

Appellant contends that the jury should have been further instructed that the Governor cannot grant a pardon "where the convict has been twice convicted of felony, unless upon the written recommendation of a majority of the judges of the Supreme Court." (Cal. Const., art. VII, § 1.) But "[t]he significant matter was that if the jury fixed the penalty of life imprisonment there were nevertheless means by which defendant could be released from prison; the precise operation of those means was of no particular importance." (*People* v. *Linden* (1959) *supra,* 52 Cal.2d 1, 25.) The court discharged its duty of instructing the jury on the "general principles of law" governing this phase of the case. (*People* v. *Rivers* (1961) 188 Cal.App.2d 189, 193 [10 Cal. Rptr. 309].) Appellant should have requested a more specific instruction on the point if he thought it desirable or necessary. (*People* v. *Wallace* (1895) 109 Cal. 611, 613 [42 P. 159].) Such an instruction would have been preferable and should be given upon retrial.

b. *The alleged erroneous admission of testimony of witnesses to two prior robberies he committed.*

Two witnesses testified to two armed robberies committed by Ketchel in 1959. Two police officers testified to Ketchel's

542

confession to these two 1959 robberies as well as to two other alleged robberies, for which Ketchel was never prosecuted. Ketchel argues that these earlier crimes bore no relation to the present criminal charges, were not "closely related in time and method" to them, and testimony as to them was therefore improperly admitted; in fact, such evidence was "no more than cumulative, since a certified copy of the judgment of the previous crimes was also introduced, showing the plea and disposition."

Section 190.1 of the Penal Code provides that where a "person has been found guilty of an offense punishable by life imprisonment or death . . . there shall thereupon be further proceedings on the issue of penalty," at which "[e]vidence may be presented . . . of the circumstances surrounding the crime, of the defendant's background and history, and of any facts in aggravation or mitigation of the penalty." ██ The jury at such penalty proceedings "performs a function similar to that performed by the Adult Authority in fixing terms and granting paroles in other cases," a function which involves an "evaluation" of all the evidence properly before it as prescribed by section 190.1. (*People* v. *Purvis* (1959) 52 Cal.2d 871, 882 [346 P.2d 22].)

██ Ketchel committed the prior robberies within three years of the robbery here involved and in each one armed himself with a gun. The number and similarity of execution of the robberies rested in the consideration of the jury as a matter of "recurrent behavior" relevant "on the issue of punishment, for it might conclude that the behavior would probably or possibly recur again were defendant given a life sentence and ultimately paroled." (*People* v. *Purvis, supra,* p. 881.) Such evidence is not cumulative because the introduction of the certified copies of the judgments of conviction on these prior robberies, alone, would not have exposed the background of the convictions.

██ Nor was it error to permit testimony as to Ketchel's admissions of guilt in letters and statements to officers investigating robbery charges on which he was not prosecuted. These specific acts of misconduct were properly considered under the broadened scope of relevant evidence sanctioned by section 190.1. (Cf. *People* v. *Ward* (1958) 50 Cal.2d 702, 708 [328 P.2d 777]; *People* v. *Jones* (1959) 52 Cal.2d 636, 647 [343 P.2d 577].)

██ Ketchel further argues that the trial court erred in admitting into evidence certain portions of his probation record

after the 1959 judgments, consisting of two letters of his probation officer. He claims these letters were hearsay and so incompetent. (*People* v. *Purvis, supra,* p. 883.) The letters expressed Ketchel's remorse and his intention to "straighten out." The court overruled appellant's objection to their introduction, with the comment that in his opinion the "letters greatly favor Ketchel." The record sustains the trial court's observation; their admission could not reasonably have prejudiced Ketchel.

### 4. *The alleged error in the instruction on parole.*

The court instructed that "a prisoner serving a life term may be eligible for parole but not until he has served at least seven calendar years." It refused to give appellants' instruction which included *inter alia* that the jury could not assume that a person sentenced to life would or would not be granted parole or be held in custody for his entire life.

"It is settled that to assist the jury in fixing the penalty, it may be informed of the minimum term a person given a life sentence for first degree murder must serve and the minimum, average, and maximum terms actually being served for first degree murder in California." (*People* v. *Purvis, supra,* p. 884.) The refused instruction would in effect have told the jury that it could not consider the information as to a minimum term for a life sentence for murder which *Purvis* holds is available to it.

The court also refused appellants' instruction concerning the specific procedure to be followed by the Adult Authority in granting and terminating paroles. The court explained that appellants would be subject to parole in the event of a life sentence. The refusal of instructions on the precise mechanics or procedure to be followed in granting paroles did not effectuate prejudicial error as to appellants. (*People* v. *Linden* (1959) *supra,* 52 Cal.2d 1, 25; see *People* v. *Reese* (1956) 47 Cal.2d 112, 116-117 [301 P.2d 582].)

### 5. *The alleged impropriety of prosecutor's arguments concerning parole and the Adult Authority.*

Appellants argue that the prosecuting attorney committed prejudicial misconduct in describing the amount of time appellants might serve in prison if sentenced to life imprisonment; that he disparaged the work of the Adult Authority and its wisdom in granting paroles; that he inferred that parole might be granted without rehabilitation;

and if "life imprisonment" is the penalty, "these men will once again walk the streets."

Argument with reference to the possibility of parole must be used with caution so as not to influence the jury's determination of penalty by matters outside both the scope of the evidence and the jury's function. Here the prosecuting attorney began his discussion of parole by stating that a first degree murderer very seldom obtained parole after serving seven years in prison. He then mentioned that the Adult Authority might make a mistake, as it did when it allowed H. B. Sears out on parole on March 12 before the June 9, 1961, robbery and homicide. On the other hand, he said that a person is rarely kept in prison for his entire life. Since no evidence disclosed what course the Adult Authority might follow in granting parole, this portion of the prosecuting attorney's argument was stricken as without the record, and the jury instructed to disregard it.

After being so corrected by the trial court, the prosecuting attorney proceeded to tell the jury what the maximum and minimum time a prisoner under life sentence would serve (Cf. *People* v. *Purvis, supra,* p. 884.) He then noted that if the jury should decide that "the proper punishment here is life imprisonment," then "in effect" that is an expression of belief or "endorsement" that "these men can be rehabilitated" and when the Adult Authority agrees that there had been rehabilitation, then "release" them. This comment only served to point up the law allowing a person under life imprisonment to be paroled after seven years in prison *if* the Adult Authority should allow it (Pen. Code, § 3046); while the prosecutor argued that a sentence of life imprisonment will mean "these men will once again walk the streets," the statement occurred in context with, and related to, the Adult Authority's finding of rehabilitation. The prosecutor did not suggest that parole would result from other causes than rehabilitation; we are not confronted with such an argument as that of *People* v. *Caetano* (1947) 29 Cal.2d 616, 619 [177 P.2d 1], where the prosecutor improperly contended that prisoners would be paroled from prison due to the congested condition of prisons.

In raising the possibility of appellants' parole from prison under a life sentence term, the People did not commit error; such a consideration composed one of the facts involved in the determination of the issue of punishment. (*People* v. *Linden* (1959) *supra,* 52 Cal.2d 1, 25.) The trial court quickly

stopped the argument based on speculation as to how the Adult Authority might treat appellants in the event of a sentence of life imprisonment; the court admonished the jury to disregard it. Since the prosecuting attorney made no misleading statements in commenting on the work of the Adult Authority in granting paroles commensurate with findings of rehabilitation, and, in the context of the argument of the prosecution in its totality, we cannot hold that appellants suffered prejudicial error.

We turn to the third and last basic tenet of appellants' argument: that the court failed to grant a continuance for hearing appellants' motions for a new trial.

The verdict was received October 30, 1961, and appellants moved for a new trial. The court set the hearing for November 16. On November 16, counsel for appellant Thomas Sears moved for a continuance. He stated that he had been transferred to the public defender's Long Beach office, where he had a heavy daily calendar, ''including court appearances substantially each day''; that the probation report on Thomas Sears had just been delivered to him ''only minutes before the hearing''; and that the record in this case was voluminous, extensive research would be required, and he would like a continuance to some time in December. The court denied the motion for continuance.

The court then heard, and promptly denied, the motion for new trial. The court further advised counsel that the probation reports ''were not going to influence him'' in any way. In these circumstances it is argued that the trial court wholly neglected its independent duty to review the evidence to ascertain whether either the degree of the offense or the penalty imposed should have been reduced; that the court's failure to grant a continuance so that counsel might have adequate time to prepare for argument of the motion demonstrated that the court ''did not even recognize this duty.''

On motions for new trial or for reduction of penalty the trial court must discharge a nondelegable duty to make an independent review of the evidence and to determine whether the degree of the offense or the imposed penalty should be reduced. (*People* v. *Love* (1961) *supra*, 56 Cal.2d 720, 728; *People* v. *Moore* (1960) 53 Cal.2d 451, 454 [348 P.2d 584]; *People* v. *Sheran* (1957) 49 Cal.2d 101, 109 [315 P.2d 5].)

Hearing and disposition of a motion for new trial is an integral part of the criminal trial. The failure to allow

counsel adequate time to prepare for this part in effect deprives a defendant of his right to counsel. (*People* v. *Sarazzawski* (1945) 27 Cal.2d 7, 17-18 [161 P.2d 934].) In short, a defendant is entitled to two decisions on the evidence, the second by the trial judge in his consideration of a motion for a new trial which was particularly important here, according to appellants, because of the alleged inadequate instructions on parole and the improper argument of the prosecutor on the subject of penalty. On such a motion it is the trial court's duty to review the evidence and to determine whether in its judgment the weight of the evidence supports the jury's verdict. (*People* v. *Borchers* (1958) 50 Cal.2d 321, 328, 330 [325 P.2d 97].) In performing that duty the trial court must " '. . . judge the credibility of the witnesses, determine the probative force of testimony, and weigh the evidence. . . .' " (*People* v. *Sheran* (1957) *supra,* p. 109.)

 The granting of a continuance is within the discretion of the trial court. (*People* v. *Buckowski* (1951) 37 Cal. 2d 629, 631 [233 P.2d 912].) Here daily transcripts of the trial proceedings were available for all counsel so that no delay was effected by waiting for the preparation of the transcript. (See *People* v. *Ashley* (1954) 42 Cal.2d 246, 269 [267 P.2d 271].) Once it became clear that the probation reports would be ready by that time, all counsel agreed to the original November 16 date. Counsel were given 17 days to prepare for the motions (October 30 to November 16) ; yet counsel for Thomas Sears without any advance notice to the trial court (see Pen. Code, § 1050) and after more than two weeks' time for preparation, moved for a continuance on November 16, on the plea that he needed more time. The record indicates that once argument on the motions for a new trial was conducted as scheduled, counsel for Thomas Sears competently covered the grounds.

At the argument on the motions appellants' counsel particularly called the court's attention to its duty to make an independent review of the evidence in accord with the case of *People* v. *Love* (1961) *supra,* 56 Cal.2d 720, 728; the record does not substantiate Thomas Sears' contention that it ignored that duty.

The court's refusal to grant a continuance here is not comparable with the *Sarazzawski* case. There the trial court compelled oral argument on a motion for new trial three days after the jury's verdict after promising counsel 13 days. (*People* v. *Sarazzawski, supra,* 27 Cal.2d 7, 11-12.) Here

counsel were clearly told when the motions would be heard and allowed a reasonable time to prepare (17 days). In these circumstances there would appear to be no abuse of discretion in denying the motion for a continuance.

The judgment of conviction, and the order denying a new trial as to H. B. Sears are affirmed with the modification that the sentence on each count be concurrent with the other. The judgment as to Donald Floyd Ketchel and Thomas Edward Sears imposing sentences for robbery and the order denying a new trial thereon are affirmed; the judgment as to Donald Floyd Ketchel and Thomas Edward Sears imposing the death penalty and the order denying a new trial on the question of penalty are reversed, and the cause is remanded for retrial and redetermination on the question of penalty only and for the pronouncement of a new sentence and judgment in accordance with such determination and the applicable law.

Gibson, C. J., Traynor, J., Peters, J., and White, J.,* concurred.

McCOMB, J., Concurring and Dissenting.—I would affirm the judgments and the orders denying the motions for a new trial in their entirety. See dissenting opinions of Mr. Justice Schauer and myself in *People* v. *Love,* 56 Cal.2d 702, 734-756 [16 Cal.Rptr. 777, 17 Cal.Rptr. 481, 366 P.2d 33, 809].

Schauer, J., concurred.

The petitions of appellants Ketchel and Thomas Edward Sears for a rehearing were denied June 4, 1963.

---

*Retired Justice of the Supreme Court sitting pro tempore under assignment by the Chairman of the Judicial Council.