Filed 1/22/14  P. v. Eslava CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MARIO ESLAVA,<br><br>        Defendant and Appellant. | A135568<br><br>(San Francisco County<br>Super. Ct. No. 216995) |

Defendant Mario Eslava was charged with one count of murder after he stabbed to death his roommate, Troy Swann.  A jury convicted him of the lesser included offense of voluntary manslaughter and found true an enhancement allegation that he used a deadly or dangerous weapon.[1]  The information also contained other enhancement allegations that related to a prior conviction for battery with a serious bodily injury.  One was that the prior conviction qualified as a "strike," and another was that it was for a "serious felony."[2]

---

[1] All statutory references are to the Penal Code unless otherwise noted.  The murder charge was brought under section 187, subdivision (a), the manslaughter conviction was based on section 192, subdivision (a), and the enhancement for using a deadly or dangerous weapon was based on section 12022, subdivision (b)(1).

[2] The battery conviction was based on section 243, subdivision (d).  The enhancement allegations that this conviction was for a serious felony and was a strike were based on section 667, subdivisions (a)(1), (d), and (e) and section 1170.12, subdivisions (b) and (c).  A third enhancement allegation charged that the battery conviction constituted a prior felony with a prison term (§ 667.5, subd. (b)), but the trial court did not rely on this allegation in sentencing Eslava.

The trial court sentenced Eslava to 18 years in state prison. This sentence was established by imposing the mid-term of six years for the manslaughter conviction; doubling the base term because the prior conviction was a strike; adding five years because the prior conviction was for a serious felony; and adding one year because Eslava used a deadly or dangerous weapon in killing Swann.

On appeal, Eslava contends that his manslaughter conviction should be reversed because he was prevented from introducing certain character evidence about Swann and a recording of a 911 call Eslava made the day before the killing. He also contends that the trial court improperly determined that his prior battery conviction was for a serious felony and was a strike.[3] We reject Eslava's first two arguments, and we therefore affirm his manslaughter conviction and the enhancement that he used a deadly or dangerous weapon. But we reverse the part of his sentence resting on the two enhancement allegations related to his prior conviction for battery. On remand, the People have the burden to prove these allegations at a bench trial.

## I.
### FACTUAL AND PROCEDURAL BACKGROUND

Eslava and Swann lived together in room 228 of a single-room-occupancy hotel at 1139 Market Street in San Francisco. Eslava originally rented the room by himself, but Swann moved in as his roommate about two months before the killing. Swann, aged 42, was approximately six feet, four inches tall and "a big, big guy." Eslava, who is approximately five feet, eight inches tall, was aged 54 and "muscular" at the time he killed Swann.

---

[3] In a related petition for a writ of habeas corpus (No. A140018), Eslava likewise offers various arguments why the prior conviction cannot be used to enhance his sentence. We deny that petition today by separate order.

A.      *Eslava Calls 911 the Day Before the Killing.*

Early on the morning of January 1, 2011, the day before the killing, Eslava called 911 to report that Swann had a knife.  Two San Francisco police officers responded to the hotel within minutes.  Officer Brian Cotter testified that when he arrived he observed a man, whom he later identified as Swann and who matched the 911 caller's description of the person with a knife, "wobbling" and "laying all over the wall" as he tried to unlock the door of another room on the same hall as room 228.  Officer Cotter handcuffed and searched Swann but found no knife in his possession.  According to Officer Cotter's partner, Officer Nicholas Territo, Swann seemed "puzzled" by being detained, but was "very hippy like, very kind of mellow, like . . . a stoner kind of guy" and was not upset.

Officer Cotter then went to room 228 to speak to Eslava, who acknowledged that he had made the 911 call.  Officer Cotter asked Eslava why he had called since Swann did not have a knife.  Eslava, who was "agitated," maintained that Swann had a knife and had threatened him with it.  He insisted that the officers search Swann again.  Officer Territo did so, but again no knife was found.  With Swann's permission, Officer Territo also searched Swann's area of the room and found a small, folded Swiss Army knife in the nightstand.  Eslava then admitted that he had called 911 because Swann "owed him $500," and because Swann had "been in the room all night bothering" him and "wouldn't turn the lights off."  The officers decided there was no reason to arrest Swann, and they left after making sure that the roommates were not going to fight.

B.      *Eslava Stabs Swann to Death.*

Several witnesses testified about the following day's events.  One hotel resident testified that around 5:30 a.m. on January 2, she heard running in the hallway and Swann saying, "Stop him; stop him; he has my keys."  She recalled hearing Swann at the front desk on two separate occasions later that day yelling about not having his keys and sounding "really upset."  Swann was normally "goofy," and she had never before observed him so angry.

One of the hotel's managers testified that Swann came to the front desk around noon to ask for his keys, claiming that Eslava had taken them.  Eslava had previously told

3

her that Swann was going to move out on December 31. Swann was "very upset" and "very rude," which she found to be unusual behavior for him. The manager told Swann that Eslava was in their room and that Swann should try to get a key from him. A few hours later, a housekeeper came to the manager's office and told her to call 911 because someone was bleeding in the hallway upstairs.

Another hotel resident testified that around 2:45 p.m., she heard several people in the hallway outside her room talking about someone bleeding. When she went outside to see what was going on, Swann was on his back in the hall and "[b]lood was everywhere." When she asked Swann, "Who did this?" he answered, "Mario." Eslava, who was standing near Swann, responded, "Self-defense," and he crossed his arms in front of his neck as if to signal that Swann had choked him from behind. When the police arrived, Swann told one of the officers that "Mario" was responsible and Eslava said, "I'm Mario. I did it. Self-defense," raised his hand, and again made a choking motion around his own neck.

Swann was stabbed 14 times, primarily in the abdomen and legs, and he died at the hospital from blood loss. A forensic toxicologist testified that Swann had Xanax and a "significant" amount of cocaine and methadone in his blood. He also tested positive for marijuana. The toxicologist testified that the drugs could have affected Swann's behavior and reaction to being stabbed in a number of ways, from giving him "super human strength" and making him more aggressive to making him calmer and less resistant to attack.

The police recovered a bloody knife, consistent with Swann's wounds, from a garbage can located a few feet from where Swann was lying. A crack pipe was found in Swann's pants, but he did not have any weapons.

C.     *Evidence of Eslava's Propensity for Violence Is Admitted.*

Several witnesses testified about prior incidents in which Eslava had been violent or threatening. A postal worker testified that Eslava hit him in the head with a club after he refused to let Eslava collect mail from a box without showing identification. A chef instructor at City College of San Francisco testified that Eslava punched him in the face

4

after he was unable to answer questions about a meal-card program. A San Francisco police officer testified that she detained Eslava after he hit someone on the street in the face, apparently with a set of brass knuckles. Finally, a nurse at San Francisco General Hospital testified that while Eslava was being "treated for an acute psychiatric issue," she heard him say that "he was going to take a gun or a knife or anything that he could pass through a metal detector and kill" a certain police detective.

> D.    *Evidence of Swann's Propensity for Violence Is Mostly Admitted.*

The defense contended Eslava stabbed Swann in self-defense after Swann put him in a chokehold from behind. In support of this theory, four witnesses testified at trial about Swann's propensity for violence. But the trial court limited the testimony of one of these witnesses, James Green, and excluded the testimony of a fifth witness, Michael Bollinger.

Green, a friend of Eslava's and fellow resident of the hotel, was permitted to testify that several days before the killing, Swann "physically confronted" Eslava by stepping very close to his face and, without making contact, backing him up against a wall. According to Green, Eslava had not provoked Swann and seemed "very, very intimidated." Green testified that Swann "backed . . . down" from Eslava when Green, who is approximately six feet, two inches tall, stood up. As we discuss in more detail below, Green was not, however, permitted to testify about a voicemail message Eslava left him on the morning of the killing.

The other three witnesses to testify about Swann's propensity for violence were Alejandro Gaitan, James Wisner, and Monique North. Gaitan, who worked in the bookstore at City College of San Francisco, testified that about three-and-a-half years before Swann's death, Swann became "very agitated" when the bookstore declined to buy back some of his books. Swann then grabbed a large sign weighing 40 to 50 pounds and threw it over an overpass outside "like he was throwing a javelin."

Wisner was a friend of Swann's, and he testified that while Swann was "a very nice person," he had "issues" and his drug use sometimes made him "unpredictable."

5

Swann had become violent and had scared Wisner on a few occasions, including during one incident three to six months before Swann's death when Swann punched him.

Finally, North, who had a long-distance relationship with Swann, testified about two occasions when she feared him. A little more than a year before his death, Swann visited North at her home for two weeks and "act[ed] strange, and he would . . . sometimes be . . . spaced out, and he would just suddenly fall asleep or he would be going back and forth . . . sort of pacing around." While he was there, Swann became upset because he was unable to obtain methadone. North, who lived alone, became so uncomfortable with Swann's behavior that she asked her husband to help her get him to leave. After Swann overheard North talking to her husband, he said he would get his cousins in the Secret Service to "pulverize" North's house, which she took as a threat. He also told her, "Just know that if you break up with me, I will fucking kill you."

About six months later, North visited Swann in San Francisco. Swann was acting "weird," apparently on drugs and "drinking heavily." Swann got "very, very, very upset and very, very angry" when North made it clear she was not going on a trip to Yosemite they had planned. He began lunging at imaginary attackers with a knife. After North said she did not feel well, he told her to take some pills he offered, and she felt she had no choice but to do so. She became "violently ill" and thought she was "going to die." Too sick to walk, North dragged herself out of the hotel room where they were staying to seek help after Swann fell asleep. She was admitted to the hospital, where testing confirmed that she had ingested methadone.

*E.     The Jury Finds Eslava Guilty of Voluntary Manslaughter.*

The jury was instructed on murder, the lesser included offense of voluntary manslaughter based on imperfect self-defense (unreasonable use of self-defense), involuntary manslaughter, and reasonable self-defense as a basis for acquittal. The verdict finding Eslava guilty of voluntary manslaughter established that the jury concluded Eslava killed Swann in imperfect self-defense.

## II.
## DISCUSSION

*A.*     *The 911 Recording Was Properly Excluded from Evidence.*

Eslava first contends that his manslaughter conviction must be reversed because he was prevented from introducing into evidence the recording of his 911 call made the day before the killing. We disagree.

Before trial, Eslava moved to introduce the recording under the spontaneous-statement exception to the hearsay rule. (Evid. Code, § 1240.) He argues that the trial court's exclusion of the recording denied him his constitutional rights to cross-examine witnesses, to present a defense, and to receive a fair trial. Whether a statement is spontaneous under section 1240, and thus " 'sufficiently trustworthy to be presented to the jury,' " is a question of fact for the trial court, and we review its ruling for an abuse of discretion. (*People v. Poggi* (1988) 45 Cal.3d 306, 318-319.)

Eslava claims that the trial court found that the recording *was* admissible under Evidence Code section 1240 but nevertheless excluded it "based on [the court's] conclusion [Eslava] had made a false report when he made the call." He claims that it was for the jury to decide whether the report was false. We disagree with these contentions.

The trial court explained its denial of Eslava's motion as follows: "[T]he reason [the Evidence Code section 1240] exception was carved out [was] it has some indication of reliability when someone perceives [a] . . . startling event and they make a comment about it. Human experience dictates that whatever they saw about that event, because it is so startling, comes in as an exception to hearsay. [¶] The concern of the court is when taken as a whole, there do[] not seem to be the indicia of reliability regarding the . . . 911 call for the following reasons: There's no knife found . . . what [Eslava] is saying [is] the person has a knife. If the person actually had a knife, the court's ruling would be different. The roommate did not have a knife. And that's what [Eslava]'s supposedly spontaneously telling the 911 operator when he makes the call. It's that my roommate is outside. He's threatening me with a knife. And so it is the knife that is the issue. But

7

there was no knife when the officers came.  [¶]  They searched the roommate.  They searched his area, . . . but there was no knife that was present.  But that's what [Eslava]'s saying in the 911 call that he's been threatened with a knife and that his roommate's at the door and he's frightened because he has a knife.  Given that was not true, *the Court is not going to allow it under* [*section*] *1240 as spontaneous statement*."  (Italics added.)

The trial court's reasoning was clear.  Because it found that Swann did not have a knife, the court determined that Eslava's statements during the 911 call were false, not spontaneous, and thus did not qualify for admission under Evidence Code section 1240.  (See *People v. Poggi*, *supra*, 45 Cal.3d at p. 318 [" 'the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance' "].)  It was the court's role, not the jury's, to determine whether the statements were spontaneous, and thus sufficiently reliable to be admitted.  (*Ibid.*)  While we agree with Eslava that the officers' failure to find a knife on Swann "does not automatically result in a conclusion [Eslava] deliberately made a false call," there was more than enough other evidence justifying the trial court's finding that the recording was not an excited utterance, including Officer Cotter's testimony that Eslava admitted that he had really made the call because Swann owed him money and was bothering him.  The court did not abuse its discretion in excluding the recording under section 1240, and the ruling therefore did not violate Eslava's constitutional rights.  (See *People v. Ayala* (2000) 23 Cal.4th 225, 269 [" '[a] defendant does not have a constitutional right to the admission of unreliable hearsay statements' "].)

Eslava also argues that once Officer Cotter testified about responding to the 911 call, Evidence Code section 1523 required that the recording itself be admitted.  Under section 1523, "oral testimony is not admissible to prove the content of a writing" except in circumstances inapplicable here.  This section *excludes* the admission of certain testimony.  Thus, even if an argument could be made that the statute provided a basis for excluding Officer Cotter's testimony, it does not support Eslava's argument that the recording was required to be *admitted*.  In any case, Eslava did not argue below that the

8

recording was admissible on this basis, and he has therefore waived the issue. (*People v. Kaurish* (1990) 52 Cal.3d 648, 704.)[4]

   B.     *Eslava's Challenge to the Exclusion of Some Evidence of Swann's Character Fails.*

Eslava also argues that his manslaughter conviction must be reversed because the trial court improperly limited testimony about Swann's "aggressive and violent character." He challenges the full exclusion of Bollinger's testimony and the partial exclusion of Green's testimony. We reject this claim.

We begin by assuming, as the parties do, that the excluded testimony met the threshold requirements of Evidence Code section 1103, which permits the admission of evidence of a crime victim's character in certain circumstances.

   1.     Bollinger's testimony was properly excluded.

Michael Bollinger was a friend of Swann's, and Eslava sought to have him testify about an incident in which he was attacked by Swann. A pretrial hearing was held under Evidence Code section 402 to determine the admissibility of this proposed testimony. At this section 402 hearing, Bollinger testified that in September 2002, Swann asked him to obtain heroin, and the men used it together in Bollinger's apartment. Swann left, but returned later and asked Bollinger to get him more drugs. Bollinger testified that as he was getting up, Swann hit him on the head from behind and Bollinger passed out. When he awoke, Swann was standing over him and asked where Bollinger's drugs were. Swann then searched Bollinger's cabinets, occasionally "stop[ping] to sort of kick" Bollinger. Bollinger remembered that as Swann left the apartment, Swann "look[ed] at [a] crowbar . . . on [the] table . . . and I thought I was going to die at that point. I really did." Bollinger testified that Swann had never before shown a violent side and that the men remained friends after the incident. He also testified that for some time afterward

---

[4] Eslava also cites *People v. Whitehead* (1952) 113 Cal.App.2d 43, which mentions the rule in Evidence Code section 356 that "[w]here part of a[] . . . conversation . . . is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party." Because he did not argue below for the recording's admission on this basis either, he has also waived this claim.

9

Swann appeared to be improving his life but, when he last saw Swann in 2008, Swann did not seem to be doing well.

The trial court excluded Bollinger's testimony under Evidence Code section 352, which permits the exclusion of evidence when its "probative value is substantially outweighed" by its potential to cause prejudice. The court found that the testimony should be excluded because the incident had occurred years ago and because Bollinger had stated that the behavior was "aberrant" for Swann and that Swann was later "getting his life together."

Before addressing the substantive merits of this claim, we first consider the Attorney General's contention that Eslava waived his argument about Bollinger's testimony. After the Evidence Code section 402 hearing and upon ruling that the testimony would be excluded, the trial court said to Eslava's counsel, "I don't want you to let [Bollinger] go. I want to see what the other witnesses have to say. I know I'm doing [the various section 402 hearings] one at a time. If there seems to be a common thread or theme, I may revisit the issue." The Attorney General argues that because Eslava "did not seek to revisit" this ruling, he cannot challenge it on appeal. But this argument ignores that after the other section 402 hearings were concluded, the court ordered that its "ruling on Mr. Bollinger is going [to] stand." At this point, the ruling became final, and Eslava did not waive his claim by not again moving to admit Bollinger's testimony.

We therefore turn to the merits of the ruling, which we review for an abuse of discretion. (*People v. Fuiava* (2012) 53 Cal.4th 622, 663.) Eslava argues that the exclusion of Bollinger's testimony violated his right to present a full defense. " 'Although we recognize that a criminal defendant has a constitutional right to present all relevant evidence of *significant* probative value in his favor ([citations]) . . . "the proffered evidence must have more than 'slight-relevancy' to the issues presented." ' " (*People v. Homick* (2012) 55 Cal.4th 816, 865, italics in original.) While the determination of whether evidence is substantially more prejudicial than probative is "particularly delicate and critical where what is at stake is a criminal defendant's liberty"

10

(*People v. Lavergne* (1971) 4 Cal.3d 735, 744), this principle does not prevent a trial court from relying on section 352 to exclude evidence proffered by a defendant in a criminal trial. (See *Fuiava*, at pp. 665-666 [" 'a state court's application of ordinary rules of evidence—including the rule stated in Evidence Code section 352—generally does not infringe upon' the constitutional right to offer a defense"].)

Eslava argues that the incident's remoteness in time and Bollinger's testimony that Swann seemed to have gotten his life together were not sufficient bases for the trial court's conclusion that the evidence was of "marginal relevance." We disagree. A determination that evidence is " 'too remote'—that is, of at most minimal relevance—[is a] valid ground for declining to admit it" under Evidence Code section 352. (*People v. Fuiava*, *supra*, 53 Cal.4th at p. 665; see, e.g., *People v. Gonzales* (1967) 66 Cal.2d 482, 500 [affirming exclusion of evidence of victim's reputation for violence seven years before the acts at issue as not sufficiently probative].) Eslava also argues that the other witnesses' testimony showed "Swann's continuing pattern of assaultive behavior," a pattern that refuted Bollinger's testimony that Swann had improved his life. But the court could have reasonably concluded that Swann's behavior improved after Swann attacked Bollinger in 2002, but then deteriorated closer to the time of Swann's death. Such a conclusion would have rendered Bollinger's testimony not especially helpful in determining how Swann might have acted at the time of the killing. The trial court did not abuse its discretion by excluding Bollinger's testimony under section 352.

Even if we determined that the trial court had improperly excluded Bollinger's testimony, we would conclude that the error was harmless. The jury convicted Eslava of the lesser included offense of voluntary manslaughter by finding that he acted in imperfect self-defense. Thus, the only way Eslava could have obtained a better result based on the instructions given would have been if the jury had acquitted him after concluding he acted in reasonable self-defense, or if it had concluded he was guilty of involuntary manslaughter. Eslava argues that Bollinger's testimony was key because the "heart" of his theory of self-defense was that "Swann would go 'out of his mind' when he did not get what he wanted, particularly when he was using drugs," and the testimony

11

"would have added to the jury's understanding of Swann's pattern of violence." But the court permitted testimony from four other witnesses about Swann's propensity for violence, including Wisner's testimony that Swann scared him by attacking him only three to six months before the killing and North's testimony about Swann's threatening behavior while he was under the influence of drugs. We conclude that the exclusion of Bollinger's testimony about an isolated incident of Swann's violent behavior almost a decade earlier was harmless beyond a reasonable doubt (*Chapman v. California* (1967) 386 U.S. 18, 24), and it was not reasonably probable that Eslava would have received a more favorable verdict if the court had admitted it. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

> 2.     Any error in limiting Green's testimony was harmless.

Before trial, Eslava sought to introduce testimony from Green about a voicemail message Eslava left on the morning of the killing. In his Evidence Code section 402 hearing, Green testified that around 6:00 a.m. on the morning of Swann's death, Eslava left a "frantic" message asking for Green's help because Swann was "out of control" and "out of his mind." Green did not listen to the message until about 10:00 a.m., and Eslava did not answer when Green returned the call. The defense argued that testimony about the message was admissible under Evidence Code section 1250, the state-of-mind exception to the hearsay rule, but the trial court disagreed, apparently accepting the prosecution's argument that Eslava's state of mind several hours before he killed Swann was not relevant. On appeal, the Attorney General does not dispute that this testimony was offered to establish Eslava's state of mind, but she argues that the evidence was not relevant and was not sufficiently reliable in light of Eslava's false report in the 911 call.

A hearsay statement is admissible under Evidence Code section 1250 to show "the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] . . . to prove or explain acts or conduct of the declarant." (§ 1250, subd. (a)(1), (2).) But even if a statement meets this criteria, it must nonetheless be excluded if it "was made under circumstances such as to indicate its lack of trustworthiness." (§ 1252.) In addition, " '[o]nly relevant evidence is admissible

12

(§§ 210, 350), and . . . [t]he test of relevance is whether the evidence "tends 'logically, naturally, and by reasonable inference' to establish material facts such as . . . intent." ' " (*People v. Cowan* (2010) 50 Cal.4th 401, 482.)

We need not decide the substantive questions of the testimony's relevance or admissibility under Evidence Code section 1250 because we conclude that if there was any error, it was harmless. It was undisputed that Swann was on drugs and acting erratically when he died, and testimony about the voicemail message was unnecessary to prove that point. While Green testified that Eslava was "frantic" and asking for help, Green's description of the message did not establish *why* Eslava was upset, much less that Swann had threatened Eslava or was violent. Testimony about the message would have added little to Eslava's defense in light of Green's own testimony that Swann had physically confronted Eslava days before the killing and the testimony about Swann's violent tendencies from the three other witnesses. We conclude that any error in the limiting of Green's testimony was harmless beyond a reasonable doubt (*Chapman v. California*, *supra*, 386 U.S. at p. 24) and it was not reasonably probable that Eslava would have received a more favorable verdict if the court had allowed Green to testify about the voicemail message. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

### C. *Eslava Was Entitled to a Bench Trial on Whether His Prior Battery Conviction Was a "Strike" or Was for a "Serious Felony."*

Eslava argues that the enhancement allegations charging that his prior battery conviction was for a "serious felony" and was a "strike" must be reversed because he did not personally admit to the truth of these allegations and was not advised of the constitutional rights waived by any such admission. We agree with him that these two enhancement allegations cannot stand, but for a different reason. Although Eslava stipulated that he had been previously convicted of battery with a serious bodily injury, and although he waived his right to a jury trial, he was nonetheless entitled to a judicial determination—made beyond a reasonable doubt and based on introduced evidence—on the other elements necessary to prove that the prior conviction was for a serious felony

13

and was a strike.[5]  This is because, as we discuss below, not all convictions for battery with a serious bodily injury are for a serious felony or constitute a strike.  We reverse the portion of the sentence resting on these enhancement allegations and remand for the requisite judicial determination of their truth.

We begin by reviewing the relevant procedural history.  Before trial, the trial court granted Eslava's motion to bifurcate and gave him the opportunity to try the prior-conviction allegations separately.  After the jury reached a verdict, but before it had returned to the courtroom to pronounce it, the following colloquy occurred:

"THE COURT:  . . . I need to ask since that was a bifurcated trial, at this point [defense counsel], do you wish the People to put on evidence and wish to proceed before the jury for the finding of the prior?

"[DEFENSE COUNSEL]:  No.  We'll waive the jury, your Honor.

"THE COURT:  Very well.  Mr. Eslava, I need to ask you specifically, you have the right to have a jury make a determination as to whether or not the allegation in this case that you had a prior prison commitment has been proved beyond a reasonable doubt. It's my understanding through your attorney that you wish to waive that and have this Court decide that issue.  Is that what you wish to do, sir?

"THE DEFENDANT:  Yes.

"THE COURT:  And no one has coerced you into making this decision?

"THE DEFENDANT:  No.

"THE COURT:  You've done so of your own free will?

"THE DEFENDANT:  Yes."

After the jury pronounced the verdict and was excused, but with Eslava still present, the court stated that the trial of the bifurcated issues needed to be scheduled. Defense counsel responded, "Your Honor, the legal aspect of the prior, I'm submitting as to the truth of the prior.  My challenge is the applicability of the prior."  Defense counsel

---

[5] Because we conclude that Eslava was entitled to a trial on these issues, we do not review whether the trial court correctly concluded that the battery conviction was a strike and was for a serious felony.

14

then agreed with the court that that challenge was "a sentencing issue." The court scheduled sentencing, after which the following exchange occurred.

"THE COURT: . . . [S]o the Court is clear, the defense is conceding that the allegation and please remind me which it is, it's the 12—

"[DEFENSE COUNSEL]: The 243(d) of the Penal Code, battery with serious bodily injury, we're stipulating to the truth of the prior. The issue is the application of it.

"THE COURT: Very well. So is that stipulation satisfactory to the People?

"[PROSECUTOR]: Yes, your Honor.

"THE COURT: All right. So the Court then doesn't need to decide that issue. We'll set this for sentencing."

The defense submitted a sentencing brief in which it argued that the battery conviction was not a strike or for a serious felony. The People argued the opposite, contending that Eslava's base term for the manslaughter conviction should be doubled because the battery conviction was a strike and that Eslava should receive an additional five years because the battery conviction was for a serious felony.

At the sentencing hearing, the trial court stated that Eslava had "waived his right to have the jury decide the allegation of the prior strike pursuant to [section] 667, subsection (a), subsection (d)" and that he had "through his counsel stipulated to the fact of the prior conviction for a violation of [section] 243, subsection (d) . . . but reserved the right to challenge the applicability of the prior. [¶] In other words, the defendant submitted the legal aspects of the truth of the prior but reserved challenging as he does now whether the prior constitutes a strike." The court heard argument on whether the prior conviction was a strike or was for a serious felony, which hinged on whether a police report from the incident could be used to establish that Eslava had "personally inflicted" the serious bodily injury. (*People v. Bueno* (2006) 143 Cal.App.4th 1503, 1508, italics omitted.) The defense had argued in its sentencing brief that the police report was not part of the previous record of conviction and was inadmissible hearsay, but the People disagreed. Finding it appropriate to rely on the report, which the People had attached to an earlier motion but which was never admitted into evidence, the court

15

found that "it was Mr. Eslava who personally inflicted the injury" on the prior occasion. The court then sentenced Eslava and, based on its determination that the prior battery conviction was for a serious felony (and thus a strike), it both doubled his base term and sentenced him to an additional five years.[6]

On appeal, the parties focus on whether Eslava was properly advised of and expressly waived his rights to a trial, to confrontation, and against self-incrimination before admitting the truth of the prior-conviction allegations, as required under *In re Yurko* (1974) 10 Cal.3d 857. In doing so, they apparently assume that Eslava's counsel conceded the two enhancement allegations at issue in their entirety. The record, however, does not support such an assumption, and it reveals that no judicial determination established their truth beyond a reasonable doubt and based on introduced evidence.

The stipulation by Eslava's counsel that Eslava had a prior conviction for battery with a serious bodily injury did not resolve whether the battery conviction was for a serious felony (and was thus a strike), because battery with a serious bodily injury under section 245, subdivision (d) "is not one of the crimes specified in section 1192.7, subdivision (c) as a 'serious felony.' " (*People v. Bueno*, *supra*, 143 Cal.App.4th at p. 1508.) While this crime may nevertheless qualify as a serious felony (and thus a strike) if the record of the prior conviction establishes that the defendant "personally inflicted" the injury (§§ 667, subd. (d)(1), 1192.7, subd. (c); *Bueno*, at p. 1508), the fact of conviction alone does not establish the element of personal infliction. As a result, Eslava's stipulation that he had a prior conviction under section 243, subdivision (d) was an "ordinary evidentiary stipulation" that "was [not] the equivalent of an admission of the

---

[6] Under section 667, subdivision (a)(1), "any person convicted of a serious felony who previously has been convicted of a serious felony" as the term "serious felony" is defined in section 1192.7, subdivision (c) must receive a five-year sentence enhancement. (§ 667, subds. (a)(1), (4).) In addition, "a defendant [who] has one prior serious and/or violent felony conviction" (a strike) must receive "twice the term otherwise provided as punishment for the current felony conviction." (§§ 667, subd. (e)(1), 1170.12, subds. (b)(1), (c)(1).)

16

truth of the enhancement allegation" or "tantamount to a plea of guilty." (*People v. Adams* (1993) 6 Cal.4th 570, 580, 582.) As a consequence, the trial court could accept the stipulation without advising Eslava of his constitutional rights or determining that he expressly waived them as required under *Yurko, supra,* 10 Cal.3d 857. (*Adams*, at pp. 582-583.)

But accepting the stipulation did not relieve the trial court of determining beyond a reasonable doubt whether record of conviction showed that Eslava personally inflicted the injury, which would have resolved whether the conviction was for a serious felony and was a strike. Eslava never waived his right to have a proper judicial determination of this element.[7] The trial court's finding at the sentencing hearing, based on a police report attached to a previous motion, that "it was Mr. Eslava who personally inflicted the injury" cannot substitute for a determination made beyond a reasonable doubt and based on admitted evidence. (See *People v. Delgado* (2008) 43 Cal.4th 1059, 1065-1066 ["[t]he People must prove each element of an alleged sentence enhancement beyond reasonable doubt" and can only sustain their burden of showing that a prior offense qualified for an alleged sentencing enhancement by introducing into evidence record of prior conviction that meets all " 'threshold requirements of admissibility' "].) On remand, the People have the burden to establish that the prior conviction was for a serious felony (and is thus a strike) by proving beyond a reasonable doubt that the record of conviction shows that Eslava personally inflicted the injury upon which the battery conviction was based.

---

[7] As his counsel confirmed at oral argument, Eslava concedes that he waived any right he may have had to have the jury decide the truth of the prior-conviction allegations. While he argues in supplemental briefing that only a jury can determine whether he personally inflicted the injury when he committed battery (see *People v. Wilson* (2013) 219 Cal.App.4th 500, 509-516), he does not explain how this claim survives his jury waiver.

## III.
### DISPOSITION

Eslava's conviction for voluntary manslaughter and the enhancement that he used a deadly or dangerous weapon are affirmed. The portion of Eslava's sentence resting on the two enhancement allegations involving his prior conviction is reversed. We remand for a bench trial on whether the prior conviction was a strike or was for a serious felony and for resentencing.

_____
Humes, J.

We concur:


_____
Reardon, Acting P.J.


_____
Rivera, J.